UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBALAW LIMITED,

    Plaintiff,

      v.

CARMON & CARMON LAW OFFICE and
GLOBALAW, INC.,

    Defendants and Counterclaim Plaintiffs,

      v.

GLOBALAW LIMITED, BALLARD
SPAHR ANDREWS & INGERSOLL, LLP,
JACKSON WALKER L.L.P., and GARVEY
SCHUBERT BARER,

    Counterclaim Defenndants.

Civil Action No. 03-950 (CKK)

**MEMORANDUM OPINION**
(September 11, 2006)

    Plaintiff GLOBALAW Limited, a corporation organized under the laws of the country of

Jersey and established as a international networking tool for over seventy (70) law firms across

the globe, brought this action against Defendants Carmon & Carmon Law Office and

GLOBALAW, Inc. (hereinafter, collectively "C&C"), on April 29, 2003, seeking a declaratory

judgment that (1) it was the rightful "owner of United States trademark rights in the

GLOBALAW service mark in connection with association services, namely promoting the

interests of a group of law firms providing legal services on an international basis," Compl. ¶ 19;

and (2) that "its use and its licensees' use in the United States of the GLOBALAW mark does not

constitute infringement of any rights C&C might have in the GLOBALAW mark in the United

States," *id.* ¶ 20.

On January 13, 2004, C&C filed its Answer and Counterclaim, which has become the focus of this suit.  C&C's Counterclaim named, as Counterclaim Defendants, GLOBALAW Limited (the original Plaintiff), and, *inter alia*, three law firms participating in the GLOBALAW Limited network:  Ballard Spahr Andrews & Ingersoll, LLP ("BSAI"), Jackson Walker L.L.P. ("JW"), and Garvey Schubert Barer ("GSB") (hereinafter, collectively, "Counterclaim Defendants" or "the Law Firms").[1]  C&C's Counterclaim asserts that it is the rightful owner of the GLOBALAW service mark, and alleges that C&C has used the mark in conjunction with its law and business practice in New York City, New York, since on or about 1988.  *See* C&C's Counterclaim ¶ 38.  C&C's Counterclaim seeks – among other things – a permanent injunction, treble damages, the profits of Counterclaim Defendants, and a declaration that C&C is the rightful owner of the mark based upon four separate alleged violations:  (1) trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1141(1), *see id.* ¶¶ 54-57 (Count I); (2) trademark infringement, false designation of origin, passing off, and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), *see id.* ¶¶ 58-61 (Count II); (3) false and misleading statements of fact under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), *see id.* ¶¶ 59-65 (Count III); and (4) common law trademark infringement, unfair competition, and misappropriation, *see id.* ¶¶ 66-69 (Count IV).

---

[1] C&C's Counterclaim named other law firms allegedly within the GLOBALAW Limited network as Counterclaim Defendants, but then dismissed these firms without prejudice or dropped them from the suit without being served.  *See, e.g.*, C&C's 8/2/04 Status Report at 2 [Docket Entry #41] & C&C's 8/13/04 Status Report at 2 [Docket Entry #42].

Following a round of extended, highly acrimonious discovery in this case, the closure of which remains highly contested by C&C, Counterclaim Defendants BSAI and JW brought a Motion for Summary Judgment against C&C, asserting that dismissal of all four counts contained within C&C's counterclaim was warranted.[2]  Three other motions have been filed which relate to or impact the Counterclaim Defendants' Motion for Summary Judgment:  (1) C&C's Motion to Reconsider the November 14, 2005 Opinion and Order of Magistrate Judge Alan Kay, which resolved numerous discovery-related motions; (2) C&C's Motion for Further Discovery Pursuant to Federal Rule of Civil Procedure 56(f), which was filed contemporaneously with its Opposition to the Counterclaim Defendants' Motion for Summary Judgment; and (3) Counterclaim Defendants' Objections and Motion to Strike Evidence Submitted in Support of C&C's Response to Counterclaim Defendants' Motion for Summary Judgment.  Each motion has now been fully briefed, and is ripe for this Court's resolution.

Upon a searching examination of the parties' filings, the attached exhibits, the relevant case law, and the entire record herein, the Court shall (1) grant Counterclaim Defendants' Motion for Summary Judgment as to all counts contained within C&C's Counterclaim; (2) deny C&C's Motion for Further Discovery Pursuant to Federal Rule of Civil Procedure 56(f); (3) deny C&C's Motion to Reconsider the November 14, 2005 Opinion and Order of Magistrate Judge Alan Kay; and (4) deny without prejudice as moot Counterclaim Defendants' Objections and Motion to

---

[2] GSB previously brought a Motion for Summary Judgment, *see* [Docket Entry # 105, 106], which the Court denied without prejudice on March 12, 2006 because discovery was not yet fully closed at the time the motion was filed.  *See Globalaw Ltd. v. Carmon & Carmon*, Civ. No. 03-950 (D.D.C. Mar. 12, 2006) (minute order).  Given that GSB's motion was largely replicated by the subsequent summary judgment motion filed by BSAI and JW, its fellow Counterclaim Defendants, the Court noted that it would consider all Counterclaim Defendants – including GSB – to have joined in the present motion for summary judgment.

Strike Evidence Submitted in Support of C&C's Response to Counterclaim Defendants' Motion

for Summary Judgment.

## I: BACKGROUND

*A.    The Parties*

In order to get a better understanding of the contours of this complex suit, it is necessary

to set out – in rather extensive detail – the background of the relevant parties in this action.  The

Court shall begin by looking at Counterclaim Plaintiff C&C, and then shall turn to a discussion

of Counterclaim Defendants/the Law Firms BSAI, JW, and GSB.  The Court shall then set out

the apparent overlap between the practice of C&C on one hand, and the practices of

Counterclaim Defendants BSAI, JW, and GSB on the other hand.  Following this discussion, in

the next subsection, the Court shall discuss the competing GLOBALAW's established by these

opposing parties.[3]

---

[3] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)).  As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.  The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Contrary to Local Civil Rule 56.1, C&C, in responding to the Counterclaim Defendants' Statement of Material Facts Not in Dispute, has not provided "a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 56.1 (emphasis added).  Rather than admitting, denying, or denying-in-part/ admitting-in-part each statement set out by the Counterclaim Defendants in corresponding numbered paragraphs and supporting each response through citations to the record, as required by Local Civil Rule 56.1 and this Court's August 19, 2004 Scheduling Order, C&C's "Statement of Material Facts As to Which There is a Genuine Dispute Requiring Litigation" does not respond to the Counterclaim Defendants' Statement in any organized way; rather, it essentially regurgitates C&C's Memorandum in Opposition in a different format that blends legal argument with factual claims.

The Court finds that this deviation from the mandate of the Local Civil Rule undermines

1.      Counterclaim Plaintiff – Carmon & Carmon Law Office

Defendant and Counterclaim Plaintiff Carmon & Carmon Law Office is a New York

partnership formed in 1987, and its current address is 767 Third Avenue, New York, NY 10017.

*See* HC at 14-15.[4]  C&C consists of two individual partners – Haggai and Rakeffet Carmon.  *Id.*

the purpose of the Rule, which is to assist the Court in quickly determining which facts are
actually in dispute.  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d
145, 153 (D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument, the
'relevant facts' section does not satisfy the purposes of a [Rule 56.1] statement."); *Robertson v.
Am. Airlines*, 239 F. Supp. 2d 5 (D.D.C. 2002) (striking defendant's motion for summary
judgment for noncompliance with Local Rule 7 and 56.1 because the "statement of material facts
not in genuine dispute" included no citations to the record and improperly mixed factual
allegations with argument); *Gibson v. Office of the Architect of the Capitol*, Civ. No. 00-
2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002) ("Plaintiff's Statement is
almost completely unhelpful to the Court as its provisions rarely address the facts outlined in
Defendant's Statement, instead describing in lengthy detail the 'contextual and structural
background' surrounding Defendant's stated facts.  Such excess, unresponsive verbiage is a clear
violation of both the letter and the spirit of Local Rule 56.1."); *see also Koken v. Auburn Mfg.,
Inc.*, Civ. No. 02-83B-C, 2004 WL 1877808, at *2 (D. Me. Aug. 24, 2004) (chastising plaintiff
for responding to defendant's statement of material facts by failing to cite to the record and for
using cross-references that in most cases referred to other additional statements in response to
defendant's singular statement, stating "[p]resumably [plaintiff] found this technique
expeditious.  I, however, did not."); *Leanard v. Inhabitants of the Town of Van Buren*, 182 F.
Supp. 2d 115 (D. Me. 2002) (deeming defendants' facts admitted in part because "many of
Plaintiff's statements do not actually controvert the Defendants' fact that they purport to
address").

While the purpose of Rule 56.1 was to "place the burden on the parties and their counsel,
who are most familiar with the litigation and the record, to crystallize for the district court the
material facts and relevant portions of the record," *Finnegan*, 101 F.3d at 151, the Court shall
accept the additional burden placed on it by C&C and shall not – in this instance – strike C&C's
Response to Counterclaim Defendants' Statement or accept all of Counterclaim Defendants'
facts as undisputed.  Rather, the Court shall carefully parse the record and both filings when
outlining the background of this dispute.

[4] For ease in the numerous citations to the record, the Court adopts the citation system
proposed by Counterclaim Defendants for the purposes of this motion.  Counterclaim Defendants
have attached, as exhibits 1-5, certain depositions that the Court shall cite to in this manner:  (1)
the May 7, 2002 deposition of Haggai Carmon in Opposition Proceeding No. 101,473 before the
Trademark Trial & Appeal Board, hereinafter "TTAB __"; (2) the November 22, 2004,
December 10, 2004, and February 7, 2005 depositions of Haggai Carmon in this suit, hereinafter

at 21.  From time to time, C&C has employed various legal secretaries and assistants, *see* RC at

36; HC at 500, but Haggai and Rakeffet Carmon have always been the only attorneys employed

by C&C, *see* HC at 21, which has never had any other attorneys associated with it, other than on

a periodic office sharing basis, *see* HC at 22-25, 62-68.  As Ms. Rakeffet Carmon has attested to,

C&C is small and of limited means.  *See* TTAB at 63.  Since its formation in 1987, all of C&C's

office locations and business headquarters have been located within the New York City area.  *See*

HC at 15-17.  Neither of the Carmons is rated by Martindale-Hubbell.  *See* HC at 169; Countercl.

Defs.' Mot. for Summ. J., Ex. 9 (Decl. of Charles W. Chotvacs, counsel for BSAI) ¶ 9.

The Carmons are both Israeli nationals, *see* RC at 99; HC at 261-62, and are licensed to

practice law in Israel, *see* HC at 70; RC at 6-8, 22-23, 100.  Ms. Rakeffet Carmon graduated from

Tel Aviv Law School in 1981 and thereafter worked for a number of years as the equivalent of a

criminal prosecutor/assistant U.S. district attorney before moving to the United States in 1985

with her husband, Haggai, to start their business.  *See* RC at 18-19, 100-01; HC at 264-65.

Following their move to the United States, both Haggai and Rakeffet Carmon became U.S.

citizens in 1995.  *See* 11/28/05 Haggai Carmon Aff. ¶ 3.

Ms. Carmon's legal practice in the United States focuses almost entirely in the area of

immigration, *see* RC at 13-16; HC at 523-24, and her clients are mostly Israeli nationals, *see* RC

at 121.  In 2004, Ms. Carmon had only "a few dozen" "active cases," and testified that she has

---

"HC__"; (3) the February 8, 2005 deposition of Rakeffet Carmon in this suit, hereinafter
"RC__"; (4) the March 9, 2005 deposition of Dennis Campbell in this suit, hereinafter "DC__";
and (5) the April 19, 2005 deposition of C. Baird Brown in this suit, hereinafter "CBB__".

more clients than she "can handle." RC at 15-16, 36.[5]  Rakeffet Carmon is licensed to practice in

the State of New York, but her work in states outside of New York appears to be quite limited;

for instance, Ms. Carmon remembers doing some "legal work" in Texas but has never appeared

in a Texas courtroom before a judge and jury, and has never been admitted *pro hac vice* in Texas.

*See id.* at 87.  Furthermore, she has taken one deposition in her entire career, in New York in

1988.  *See id.* at 88.

Mr. Haggai Carmon received his license to practice law in Israel in 1981, *see* HC at 70,

where he worked as an attorney for two years before moving to the United States, *id.* at 262-64.

Despite multiple attempts, Mr. Carmon has not passed any U.S. bar exam; however, given that he

has passed the Ethics Bar Examination and the New York Character and Fitness Committee's

interview, Mr. Carmon has been allowed to act as a "legal consultant" in New York (pursuant to

its state statute recognizing foreign attorneys) under certain limited circumstances, where he

provides advice on Israeli law within the State of New York.  *See* HC 57, 70-71; RC at 24-25;

*see also* 5/20/05 Rakeffet Carmon Aff. ¶ 2.  He testified that he is also licensed to practice law on

---

[5] While citing to no exhibits or tangible evidence, C&C now proclaims that "Rakeffet Carmon represents clients on many matters that go on for extended periods of time with only periodic activity – the remainder of time being spent waiting for tribunals to act.  At any given time she continually has over a hundred active matters, but may only have a few dozen on which she is actively doing things."  *See* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 25; *id.* at 10 (citing C&C's Opp'n, Ex. 14 (Rakeffet Carmon Aff.)).  C&C vaguely contends that "[t]he nature of the matters Ms. Carmon handles in her law practice is broad in scope, with many immigration matters, but many other types of matters too, including corporate law, business law, matrimonial law, criminal defense law, and civil litigation, some of which arise from the relationship she first establishes with the client in an immigration matter."  *Id.* at 26.  Problematically, (1) C&C fails to attach a second affidavit by Rakeffet Carmon, which allegedly provides this information, despite citing to it as "Exhibit 14" (that is, Exhibit 14 is blank); (2) Ms. Carmon never brought up these facts during her deposition; and (3) a review of C&C's argument reveals that virtually all of the "hundred active matters" claimed by Rakeffet Carmon are usually dormant.

"some other additional areas that [he] could advise clients pursuant to what the law says."

However, when asked about what those areas were at his deposition, he responded, "I don't

know, I don't remember.  The last time I looked it was many years ago.  I don't actually do it.  I

am sure you can find the law."  HC at 70-71; *see also* 22 NYCRR § 521.3 (setting out the

limitations on licensed legal consultants within the State of New York).  Haggai Carmon testified

that his law practice in the United States is limited to two areas:  (a) Israeli legal matters, and (b)

other legal matters outside the United States for certain departments of the United States

government, including the Division of Foreign Litigation of the United States Department of

Justice.  *Id.* at 73-76.  Mr. Carmon testified that his "experience is very unique and it does not go

along with customary definitions," and said of himself:  "I don't believe there is anyone who

does the things that I do."  TTAB at 7.  As of November 2004, Haggai Carmon had

approximately ten (10) open clients or legal files that he was handling, all concerning Israeli legal

matters and/or "worldwide" matters for the United States government.  *See* HC at 73-76.

Mr. Carmon attempted to further supplement this list following his deposition via

affidavit, which provided more detail as to the kind of law that he practices as a legal consultant

operating within the State of New York.  *See* 11/28/05 Haggai Carmon Aff. ¶ 6.  Mr. Carmon's

affidavit suggested that he had also practiced in such U.S.-based matters as, *inter alia*, the "[s]ale

of NY public company's shares," "[s]erving as an arbitrator in NY commercial arbitration,"

"[r]epresenting a NJ resident in child abduction case," "[r]epresenting a charity regarding a

bequeath in NY," "[c]opyright infringement litigation in NY," "[r]epresenting a publicly listed

company in its start-up operation in the U.S.," and "[r]epresenting NY residents concerning real

property in NY."  *Id.*

Mr. Carmon's belated affidavit, entered well after his deposition in this matter and first provided to Counterclaim Defendants as an attached exhibit to C&C's Opposition to Counterclaim Defendants' Motion for Summary Judgment, is noteworthy in two respects. First, courts have been extremely wary of allowing a party to significantly supplement, expand, and/or contradict his or her deposition testimony with a *post hoc* affidavit attached to a dispositive motion or an opposition, given the lack of opportunity for effective cross-examination or further investigation by the opposing side. *See Reetz v. Jackson*, 176 F.R.D. 412, 414 (D.D.C. 1997). "Courts have long held that a party may not create a material issue of fact simply by contradicting [his or her] prior sworn testimony . . . . '[T]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard [the later statement].'" *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) (quoting *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 706 (3d Cir. 1988)). "If a party who has been examined at length in deposition could raise an issue of fact simply by submitting an affidavit concerning [his or her] own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Accordingly, "a party's affidavit which contradicts [his or her] own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 669 (D.D.C. 1997). A review of Mr. Carmon's Affidavit, *see generally* 11/28/05 Haggai Carmon Aff., reveals that almost all of the information therein either *significantly* expands upon the details provided by the Carmons in their respective depositions, or flatly contradicts the limiting

9

statements previously given by the Carmons.  While the Court will not entirely discount the

information provided in Mr. Carmon's Affidavit given that not all of it is precisely

"contradictory," the Court does note that (1) it *could* discount certain claims that might be best

described as "so expansive and different from previous deposition testimony that they are

contradictory"; and (2) a healthy skepticism might well be justified in reviewing the overall

document.

Second, the Court is struck by the breadth of the legal activities claimed by Mr. Carmon

in his affidavit.  Importantly, Mr. Carmon has not passed a Bar Examination in the United States

and is not a licensed attorney in New York.  While Mr. Carmon is licensed to practice as a "legal

consultant" in New York, the powers of a legal consultant are quite limited.  *See* 22 NYCRR §

521.3.  In brief,

> legal consultants are expressly prohibited from, among other things, representing
> other persons in court, preparing instruments effecting the transfer of title to real
> estate located in the United States, preparing wills or trusts effecting the
> disposition on death of any property located in the United States, *or rendering*
> *professional legal advice on the law of New York or of the United States*.

6A N.Y. Jur. 2d Attorneys at Law § 46 (describing 22 NYCRR § 521.3).  In light of these

limitations, some of the extensive legal activities claimed by Mr. Carmon are inexplicable.

For instance, Haggai Carmon's Affidavit claims that C&C "handle[s] a few estates every

year and prepare[s] wills for several clients each year."  11/28/05 Haggai Carmon Aff. ¶ 9.

Given that Rakeffet Carmon testified that her practice in the U.S. focuses almost entirely in the

area of immigration, *see* RC at 13-16; HC at 523-24, one would have to assume that Mr. Carmon

was assisting or leading C&C's estate efforts.  However, pursuant to 22 NYCRR § 521.3(c)(1)-

(2), an individual licensed to practice as a "legal consultant" in New York, like Mr. Carmon, is

forbidden from "prepar[ing]" "any will or trust instrument effecting the disposition on death of any property located in the United States of America and owned by a resident thereof" or "any instrument relating to the administration of a decedent's estate in the United States of America." As noted above, Mr. Carmon's Affidavit also claims that he has "practiced" in such matters as the "[s]ale of NY public company's shares," "[s]erving as an arbitrator in NY commercial arbitration," "[r]epresenting a NJ resident in child abduction case," "[r]epresenting a charity regarding a bequeath in NY," "[c]opyright infringement litigation in NY," "[r]epresenting a publicly listed company in its start-up operation in the U.S.," and "[r]epresenting NY residents concerning real property in NY." *See* 11/28/05 Haggai Carmon Aff. ¶ 6. It is difficult to imagine how Mr. Carmon could engage in these practices without "render[ing] legal advice on the law of [New York] State or of the United States of America," or "prepar[ing] an[] instrument effecting . . . the transfer or registration of title to real estate located in the United States" – two activities directly prohibited by New York's "Rules of the Court of Appeals for the Licensing of Legal Consultants." *See* 22 NYCRR § 521.3(b), (e).

While it is true that Mr. Carmon may engage in some activities under the supervision of "a person duly qualified and entitled . . . to render professional legal advice" in New York, which would presumably be his wife (the only lawyer in the firm), *see id.* § 521.3(e), it is difficult to imagine that such supervision can occur given the fact that Ms. Carmon already has more clients than she "can handle," RC at 15-16, 36, and such supervision would be impossible when Mr. Carmon was "[s]erving [as] an arbitrator in NY commercial arbitration." 11/28/05 Haggai Carmon Aff. ¶ 6(11). Regardless, what is clear is that Mr. Carmon's position as a legal consultant, with its attendant limitations, ensures that the amount and type of work that C&C – a

two-person firm – can do is inherently narrow and limited.

2.      Counterclaim Defendant –  Ballard Spahr Andrews & Ingersoll LLP

Counterclaim Defendant Ballard Spahr Andrews & Ingersoll is a 120 year-old law firm,

first established in 1886.  *See* Countercl. Defs.' Mot. for Summ. J., Ex. 7 (Decl. of C. Baird

Brown, partner at BSAI) ¶ 2.  BSAI is a large, multi-office, multi-regional law firm, which

employs over 430 attorneys and maintains seven (7) offices located throughout the mid-Atlantic

corridor and the western United States.  *Id.*  BSAI's offices are located in the following United

States cities:  Baltimore, Denver, Voorhees (New Jersey), Philadelphia, Salt Lake City,

Washington, D.C., and Wilmington (Delaware).  *Id.*  BSAI is a "full service" law firm, offering

legal services in nearly every area of corporate, civil, and white collar criminal law on a national

scope, to companies, individuals, and other entities in virtually every state and around the world.

*Id.*  BSAI lists thirty-five (35) such areas on its company website, www.ballardspahr.com.  *Id.*

BSAI currently has thirty-eight (38) Fortune 500 clients.  *See* Chotvacs Decl. ¶ 6.  Seventy-seven

(77) of BSAI's partners have achieved an "AV" peer-review rating by *Martindale-Hubbell*,

which is approximately 40% of BSAI's 196 partners.  *Id.* ¶ 5.  Forty-three (43) BSAI partners

were selected to *The Best Lawyers in America® 2006* directory by Woodward White, Inc., with

seventeen (17) having been selected for this honor for over ten (10) years, and two (2) for over

twenty (20) years – and the honorees include lawyers from six (6) of BSAI's seven (7) offices.

*Id.* ¶ 8.  Finally, thirty-three (33) BSAI attorneys were honored as "Leaders in Their Field" by

*Chambers USA: America's Leading Business Lawyers* in 2005.  *Id.* ¶ 7.

### 3.     Counterclaim Defendant – Jackson Walker L.L.P.

Counterclaim Defendant Jackson Walker is a 119 year-old law firm, first established in 1887 by the "generally recognized dean of oil and gas law," A.W. Walker.  *See* Countercl. Defs.' Mot. for Summ. J., Ex. 6 (Decl. of Bryan C. Birkeland, partner at Jackson Walker) ¶¶ 2-3.  JW is a large, multi-office Texas law firm, which employs over 300 attorneys and maintains seven (7) offices located throughout the State of Texas:  Austin, Dallas, Fort Worth, Houston, Richardson, San Angelo, and San Antonio.  *Id.* ¶ 2.  JW is a "full-service" law firm, offering legal services in nearly every area of corporate and civil law.  *Id.* ¶¶ 2-3.  JW lists some fourteen (14) areas and eighteen (18) industries served on its website, www.jw.com.  In the last eleven (11) years, five (5) of JW's attorneys have been members of the American College of Trial Lawyers.  *Id.* ¶ 2.  More than 140 of JW's attorneys have achieved an "AV" rating by Martindale-Hubbell, and thirty-two (32) were selected to *The Best Lawyers in America® 2005* directory by Woodward White, Inc.  *Id.*

### 4.     Counterclaim Defendant – Garvey Schubert Barer

Counterclaim Defendant Garvey Schubert Barer is a forty (40) year-old law firm, first established in 1966.  *See* Countercl. Defs.' Mot. for Summ. J., Ex. 8 (Decl. of Lucinda Fernald, Executive Director of GSB) ¶ 2.  GSB is a large, multi-office, multi-regional law firm, which employs over 130 attorneys and maintains five (5) offices in various United States cities and one foreign country.  *Id.*  GSB's law offices are located in the following United States cities:  New York, Portland, Seattle, and Washington, D.C.  *Id.*  GSB also maintains an office in Beijing, China.  *Id.*  GSB is a "full-service" law firm, offering legal services in nearly every area of corporate, civil, and white collar criminal law, on a national scope, to companies, individuals,

and other entities throughout the United States, China, and around the world.  *Id.*  GSB lists

thirty-two (32) different substantive areas served on its website, www.gsblaw.com  *Id.*  GSB has

approximately seventy (70) lawyers with an "AV" rating by Martindale-Hubbell, and represents

or has represented over twenty-five (25) Fortune 500 companies.  *See* Countercl. Defs.' Mot. for

Summ. J., Ex. 10 (Decl. of David Lieberworth, counsel for GSB) ¶¶ 2-3.

    5.  Apparent Overlap Between the Practices of C&C and the Counterclaim
       Defendants

   Based upon the evidence offered by BSAI, JW, and GSB, and the assertions set forth by

Haggai Carmon in his November 28, 2005 Affidavit and the attachment thereto, the practice

areas of C&C on one hand, and Counterclaim Defendants BSAI, JW, and GSB on the other hand

can be described as follows in this comparative table:[6]

---

  [6] This table is based on the table attached to Haggai Carmon's November 28, 2005 Affidavit, to which Counterclaim Defendants have objected.  *See* Countercl. Defs.' Mot. to Strike Evidence at 3-4.  According to Counterclaim Defendants, this table contains conclusory allegations regarding the length of use, geographic scope of use, scope of clientele, and breadth of C&C's law practice with no underlying facts to support them; however, Counterclaim Defendants do not object to the chart based on any inaccuracy in their listed practice areas.  *See id.* (citing *Poullard v. Smithkline Beecham Corp.*, No. Civ. A. 02-1590, 2005 WL 3244192, at *15 (D.D.C. Nov. 30, 2005) (Kollar-Kotelly, J.) (finding that plaintiff's conclusory affidavit unsupported by any record evidence was insufficient to avoid summary judgment)).  Counterclaim Defendants are correct to the extent that Mr. Carmon's affidavit makes assertions which are not backed by evidence in the current summary judgment record, as C&C's documents that would arguably support his claims were not attached to any motion currently pending before the Court.  While not ruling on the admissibility of this chart and Mr. Carmon's affidavit at this point, the Court uses it as a useful guide to set out the contours of each side's practice areas.  Ultimately, assuming *arguendo* the accuracy of this chart, the side-by-side comparison actually aids Counterclaim Defendants, as it highlights the substantial differences between their practices and C&C's areas of interest.

| | BSAI | JW | GSB | C&C |
|---|---|---|---|---|
| Affordable Housing/ Community Development | X | | X | |
| Antitrust | | X | X | |
| Appellate | | X | | * only in the form of administrative appeals |
| Bankruptcy & Creditors Rights | X | X | X | |
| Biotechnology/ Life Sciences | X | X | | * represent biotech companies in commercial matters |
| Business | X | X | X | X |
| Class Action Litigation | X | | X | |
| Commercial & Secured Transactions | X | X | X | * only commercial contract matters |
| Communications & Media Law | | | X | |
| Construction | X | | | |
| Consumer Financial Services | X | | | |
| Corporate Finance & Securities | X | X | X | |
| Eminent Domain | X | X | | |
| Employee Benefits | X | X | X | |
| Energy & Project Finance | X | X | | |
| Entertainment, Sports, & Arts | | X | X | |
| Environment & Natural Resources | X | X | X | |
| Estate Planning & Probate | | X | X | X |
| Family Wealth Management | X | X | | |
| Family Law | | | | X |
| Financial Planning & Management | X | X | X | |

| | BSAI | JW | GSB | C&C |
|---|---|---|---|---|
| Federal Taxation | X | X | X | |
| Franchise & Distribution | X | | | |
| Global Customs & Trade | | | X | |
| Government Contracts | | | X | * principally in connection with sales from U.S. to Israel |
| Health & Safety Regulations | X | X | X | |
| Healthcare Law | X | X | X | |
| Immigration | X | X | X | X |
| Indian Law | | | X | |
| Insurance Coverage & Defense | | X | X | * only represents clients up to litigation, then refers out |
| Intellectual Property | X | X | X | X |
| International Practice | X | X | X | X |
| Investment Management | X | | | |
| Labor & Employment Law | X | X | X | |
| Land Use & Condemnation | X | X | X | |
| Litigation | X | X | X | * limited only to criminal & immigration matters in the United States |
| Maritime Law | | | X | |
| Mergers & Acquisitions | X | X | X | * very small & incidental |
| Municipal Law | | | X | |
| Nonprofit & Tax-Exempt Organizations | | | X | * 2 clients in this area |
| Public Policy, Lobbying, & Political Law | | X | X | |
| Product Liability & Mass Torts | X | | | |

|  | BSAI | JW | GSB | C&C |
|---|---|---|---|---|
| Real Estate | X | X | X | 0[7] |
| Recovery | X |  |  | X |
| Resorts & Hotels | X |  |  |  |
| Securitization | X | X |  |  |
| State & Local Taxation | X | X | X | * only as an adjunct to C&C's corporation practice, wherein 8-10 corporations are incorporated each year |
| Technology & Emerging Corporations | X | X |  | * only in conjunction with commercial matters |
| Telecommunications | X | X |  |  |
| Transactional Finance | X | X |  |  |
| Valuation | X |  |  |  |
| White-Collar Criminal Law | X |  | X |  |

### B.     The Competing GLOBALAW's

### 1.     GLOBALAW, Inc. – C&C

#### a.     Formation and the Initiation of This Lawsuit

According to the unsupported affidavits of Rakeffet and Haggai Carmon, C&C began using the mark "GLOBALAW" in connection with its services as early as 1987.  *See* 5/20/05 Rakeffet Carmon Aff. ¶ 5 ("Carmon commenced using the mark GLOBALAW in interstate commerce as early as 1987."); 11/28/05 Haggai Carmon Aff. ¶ 1 ("I invented or created the word Globalaw in 1987 to identify the legal services my wife and I would provide in our partnership, Carmon & Carmon."); *see also* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., Ex. 13

---

[7] According to Haggai Carmon, C&C "handle[s] no real estate work except when we associate real estate lawyers."  11/28/05 Haggai Carmon Aff. ¶ 9.

(Decl. of Eugene Lemay, head of a NY/NJ storage and moving company that has used C&C's services) (undated) ¶ 2 ("I have been using the professional legal services of Rakeffet Carmon, Esq., of the law firm of Carmon & Carmon-GLOBALAW since 1987.").[8]  However, C&C waited until 1994 to form "GLOBALAW, Inc.," a New York corporation which shares an address with C&C but has no employees, no income, and no expenses.  *See* HC at 43-46 (also noting that C&C and GLOBALAW, Inc. are collectively referred to as "C&C").  GLOBALAW, Inc. is not a law firm and does not provide any type of legal services.  *See id.* at 32 ("GLOBALAW, Inc. never appeared anywhere.  It is not a law firm.").  Indeed, GLOBALAW, Inc. has not done business since 2001.  *See id.* at 45-46 ("[W]e did not fold it, the company is still legally registered.  It is not active.  It has not done business since, I believe, 2001.  There is no income, no expenses.").  However, according to the Carmons, they have treated GLOBALAW, Inc., as being equivalent to and interchangeable with C&C since its formation. *See id.* at 26-27, 30, 43-49; *see also* C&C's Mot. to Reconsider at 13 ("Therefore, a factually correct statement should have been that 'Carmon & Carmon and GLOBALAW were used interchangeably.'").  While "GLOBALAW, Inc." no longer exists, C&C "did and still does practice law . . . under the service mark . . . GLOBALAW (without 'P.C.' or Inc.')."  C&C's Reply to Countercl. Defs.' Opp'n to C&C's Mot. to Reconsider at 4.

---

[8] As noted above, Counterclaim Defendants strongly object to these assertions made in the Declarations of Haggai and Rakeffet Carmon, which are conclusory and unsupported by any documents in the present record.  Indeed, C&C admits as such with respect to Rakeffet Carmon's Affidavit, noting that "there was no record or document" to support her claimed use of the mark since 1987 or 1988.  *See* C&C's Opp'n to Countercl. Defs.' Mot. to Strike Evidence at 2. Counterclaim Defendants claim that this failure on the part of C&C to produce any extrinsic evidence in the present record to support its timeline ensures that C&C's unsupported allegations must be stricken pursuant to *Poullard* and *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210 (11th Cir. 2000).

Apparently, C&C filed for federal registration of the "GLOBALAW" mark in the United States Patent and Trademark Office on March 28, 1994 based upon first use of the mark as of January 22, 1988; however, according to the Carmons, this application was rejected "for technical reasons." *See* 5/20/05 Rakeffet Carmon Aff. ¶ 5. During this same period, another "GLOBALAW" was being formed – that is, "GLOBALAW Limited," which is the mark used by the Counterclaim Defendants. In 1993, Dennis Campbell, the director of an international legal studies institute in Austria, formed and began administering a network of lawyers under the "GLOBALAW Limited" rubric. *See* DC at 13-16, 29, 31-32. This network started with forty (40) or fifty (50) law firm members. *See id.* at 31-32. In November 1994, Campbell filed an application in the United States Patent and Trademark Office requesting federal registration of the service mark "GLOBALAW" for "association services." *See id.* at 29; Birkeland Decl. ¶ 6. Following Campbell's valid application, C&C filed a U.S. application for registration of the name "GLOBALAW" for "foreign and international legal services" on February 3, 1995. *See* Birkeland Decl. ¶ 6; *see also* USPTO website, *available at* http://www.uspto.gov (wherein C&C, in Reg. No. 74629447, states that it is registering the term under International Class 035, for "foreign and international legal services"). In addition, Haggai Carmon of C&C filed an opposition to Campbell's registration in 1996. *See* DC at 42. Discovery and various procedural events caused the proceeding before the TTAB to continue without resolution through about 2001, and was stayed pending the outcome of this litigation. *See* Birkeland Decl. ¶ 6. Throughout all of this, C&C not once attempted to stop the use of the name "GLOBALAW" by GLOBALAW Limited, or by any of the Law Firms. *Id.*; HC at 366-70; RC at 55. In particular, C&C did not seek injunctive relief. *Id.* Finally, in April 2003, GLOBALAW Limited brought

19

suit against C&C in this Court for declaratory relief, seeking a judgment that it was the rightful

owner of the mark.  *See* Compl. ¶¶ 19-20.  C&C and GLOBALAW, Inc. countersued in January

2004, leading to the present dispute.  *See* C&C's Counterclaim ¶ 38.

> b. *How Has the Mark "GLOBALAW, Inc." Been Held Out to the Public?*

A review of C&C's Counterclaim and the deposition of Haggai Carmon shows that

C&C's public use of the mark "GLOBALAW" is inexact and frequently shifting.  The

"GLOBALAW" service mark has been publicly employed by C&C in at least three ways:

1. The "GLOBALAW" mark has appeared in one form at the top of C&C's letterhead, prominently bearing the words "Carmon & Carmon," with the following words, in much smaller script, on the right side of the page:  "Administrators of GLOBALAW℠ A Worldwide Network of Independent Law Firms."  *See* Countercl. Defs.' Mot. for Summ. J., Ex. 13 (4/11/00 C&C Letter).

2. At other times, it has appeared at the top of the firm's letterhead, stating:

GLOBALAW℠

EXCLUSIVELY FOREIGN AND INTERNATIONAL LAW
A DIVISION OF
CARMON & CARMON
LAW OFFICES

*See id.*, Ex. 14 (2003 letter from C&C ).

3. Finally, a website maintained by the Carmons, located at www.globalaw.com, provides:

   GLOBALAW is an international law firm assisting its clients in their foreign legal matters through its network of members in 85 countries.  Break the time, language and cultural barriers.  Call GLOBALAW with your foreign legal questions.

   \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

   A New York based international law firm exclusively dedicated to foreign and international law serving individuals, corporations and the U.S. Government.

   Foreign Law.  Transactional Law.  <u>Private International Law</u>.  Public International

20

Law.  A maze of the unknown without a roadmap.  Need a guide?  Call
GLOBALAW[.]

Certain rights, recognized by some legal systems, are denied by others.  Any
person transacting with a foreign country privately or within a business may need
to be aware of the rights and liabilities under that particular country's laws.  Do
you know what they are?

If you have a problem involving these areas of the law, or would simply like to
avoid one:  Call GLOBALAW.

*See* Chotvacs Decl. ¶ 3 & Ex. U (screen shot of <u>www.globalaw.com).</u>  This
appears in conjunction with a logo that contains the term "GLOBALAW."  *Id.*

C&C does not contest any of these varying uses, despite the fact that #2 and #3 arguably

run afoul of the New York State Bar Association *Lawyer's Code of Professional Responsibility*.

The State of New York has long prohibited trade names pursuant to DR 2-102(B), which

provides:

A lawyer in private practice shall not practice *under a trade name*, a name that is
misleading as to the identity of the lawyer or lawyers practicing under such name,
or *a firm name containing names other than those of one or more of the lawyers
in the firm* . . . .

22 NYCRR § 1200.7[B] (emphasis added).  As such, New York has consistently censured firms

which attempt to use some form of trade name in a manner similar to the way the Carmons have

– at times – used the GLOBALAW mark within the State of New York.  *See Matter of Shephard*,

92 A.D.2d 978, 459 N.Y.S.2d 632 (1983) (censuring firm entitled "The People's Law Firm of

Jan. L. Shephard, Attorney, P.C." for practicing under a trade name); *cf. Matter of von Wiegen*,

470 N.E.2d 838, 63 N.Y.S.2d 163 (1984) (allowing lawyer to use the phrase "The Country

Lawyer" in a flyer "because the lawyer's name was inserted apart from the motto").

21

     c.     *What Have Been the Practical Contours of C&C's "GLOBALAW, Inc." or "GLOBALAW" Since Its Inception?*

In addition to the fact that C&C's public use of the mark "GLOBALAW" has differed in substantial ways throughout the years, C&C has also been sporadic and inconsistent as to the precise contours of its "GLOBALAW, Inc." or "GLOBALAW" in this lawsuit. In its Answer and Counterclaim, C&C explained that it used the "GLOBALAW" mark

> as a means of connecting many firms around the world, including the United States, in a network of law firms in order to refer work to each other and receive referrals from each other. They used and are continuously using the Mark as an indication of their own worldwide contacts with law firms in the United States and in many countries. In both of these ways and in others, they used and continuously use the Service Mark, inter alia, to designate the source of their law and business practice.

C&C's Counterclaim ¶ 38. C&C further claimed in its Counterclaim that it "sent membership packages to many law firms in the 1980s and 1990s soliciting or facilitating their membership in their alliance of law firms called 'Globalaw.'" *Id.* ¶ 40.

Following the Counterclaim Defendants' extended attack on the existence of such a claimed "network" instigated by C&C through its "GLOBALAW" imprimatur, C&C has abandoned its initial "network" allegations. Indeed, C&C – in its Opposition to Counterclaim Defendants' Motion for Summary Judgment – criticizes Counterclaim Defendants for making a "straw horse" issue out of its non-existent network, arguing:

> Carmon is not here claiming a network of lawyers. It is asserting that the GLOBALAW service mark identifies the source of the firm's legal services. Haggai Carmon repeatedly affirmed and reaffirmed in his depositions that GLOBALAW is the same as Carmon and Carmon – it is the name the firm uses to identify itself in the practice of law and its services. (Exh. 11). Counterclaim Defendants['] attempt to erect a straw horse network issue so they can knock it down in their memorandum. Carmon does not lay claim to infringement or monetary award relating to a network owned, operated by, or conducted by

22

> Carmon & Carmon.  Whether there was or is a group of law firms Carmon has
> worked with in the past or works with now in the form of a network, is irrelevant
> to the infringement and monetary award sought in this case.

C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 9-10; *see also id.* at 12 n.4 ("Globalaw,

Inc. was merely a service company and ceased to operate several years ago.  It never had a

network."); *but see* 11/28/05 Haggai Carmon Aff. ¶ 4 (apparently contradicting this contradictory

argument, noting that "[i]n this litigation, we do not claim anything for the network of law firms

we have formed and worked with over many years").

Given that C&C has offered two, completely contradictory claims in its pleadings about

what "GLOBALAW, Inc." or "GLOBALAW" actually *is* or *does*, the Court shall turn to the

evidence in the record to try to get a better understanding of GLOBALAW, Inc.'s contours for

the purposes of this suit.  Upon examination of the evidence, it appears as though C&C's newest

allegation – i.e., that "GLOBALAW" is merely a synonym for "C&C" and its individual work –

is the most accurate.

For instance, while "GLOBALAW, Inc.'s" website claims that it "is an international law

firm assisting its clients in their foreign legal matter through its network of members in 85

countries," *see* Chotvacs Decl. ¶ 3 & Ex. U (screen shot of www.globalaw.com), Haggai Carmon

himself now admits that GLOBALAW, Inc. is not a law firm and does not provide any type of

legal services.  *See* HC at 32 ("GLOBALAW, Inc. never appeared anywhere.  It is not a law

firm.").  Moreover, while both its website and its Counterclaim repeatedly reference a network of

law firms associated through "GLOBALAW, Inc.," C&C's frequently alleged network is

unfounded.  Simply, C&C has no idea of who is (or is not) a member of its so-called network and

has made no effort to recruit members.  During Mr. Carmon's TTAB deposition, he was asked if

there was a list that existed of the members as of May 7, 2002, that are part of C&C's

"GLOBALAW" network; Mr. Carmon responded:  "We have a list but I don't know if it is still

valid."  TTAB at 50.  Mr. Carmon's list of alleged network members is not publicly available.

*See* HC at 342.  Also, it was C&C's practice not to recruit U.S. attorneys into any network, and it

therefore made no effort to systematically communicate with U.S. attorneys to that end.  *See* HC

at 188-89, 684-86; TTAB at 48-49.  C&C also made no effort to track who was using the

GLOBALAW name and who was not, *see* HC at 683-84, and Mr. Carmon does not know which

of the people on his list of alleged network members is actually using the designation

"GLOBALAW," *see id.* at 339-41.  C&C does not track the referrals it receives from other

attorneys, *see* RC at 42-43, and also has not arranged for any supposed member law firms to

secure *any* rights to the name Globalaw outside of the United States, *see* HC at 691.

    Indeed, with but one exception, there were or are no written agreements or other

formalities binding C&C or "GLOBALAW, Inc." with any other U.S. law firms.  *See* HC at 135.

The sole "exception" was an agreement in or about 1994 with a law firm in Seattle that Mr.

Carmon could not identify by name at his deposition.  *See id.* at 136-37.  C&C admits that it has

not communicated with that unknown firm for a number of years, *see* HC at 185, and that C&C

has belatedly learned (as a result of inquiries made after Haggai Carmon's deposition) that the

firm ceased to exist in the United States years ago, with the result that it is no longer authorized

to use the GLOBALAW name, *see id.* at 565-67, 677.  Mr. Carmon explained his failure to

notice that the only other alleged member of his network left the country years ago by stating,

"But they vanished . . . and I had no reason to suspect that there was anything wrong . . . ."  *Id.* at

702.  C&C has not had any communication with that firm since 1996, and cannot even say

whether or not the firm ever used the name "GLOBALAW." *Id.* at 135-38.  Indeed, at his

deposition, Mr. Carmon could name only three (3) attorneys in the United States to whom C&C

gave permission to use the name "GLOBALAW," *id.* at 139-47, and C&C has no idea how these

individual attorneys may – or may not – have used the name, when such "use" stopped or started,

or even where some or all of these attorneys are now located, *id.*

Accordingly, a review of the evidence in the record before the Court indicates that C&C

has described "GLOBALAW" as a viable network of numerous international law firms and has

used the mark "GLOBALAW" in a manner approximating a trade name.  However, in practice,

"GLOBALAW, Inc." has basically been a synonym for the work of C&C alone, used to denote

and promote the fact that the two-person law firm specializes in international law and has

experience in that field.  Rather than being "global" in scope, C&C's practice – and thereby its

use of the "GLOBALAW" mark – has been confined almost entirely to the State of New York,

specifically, New York City, and the sovereign nation of Israel.  *See* 11/28/05 Haggai Carmon

Aff. ¶ 6 (listing the matters on which he has worked).  Indeed, while C&C claims that it has

"promoted the mark GLOBALAW extensively for at least [the] past 18 years, using word of

mouth, print advertising, brochures, a web site, and other means," *id.* ¶ 2, C&C admits that it has

spent only approximately $15,000.00 nationwide on advertising annually, *see* Countercl. Defs.'

Reply at 10 (citing C&C's Resp. to Countercl. Defs.' Interrogs.).

        2.      <u>GLOBALAW Limited – the Counterclaim Defendants</u>

        a.    *Formation*

As noted above, "GLOBALAW Limited" – an international network of more than

seventy (70) law firms, and over 2,600 lawyers, in over seventy-five (75) jurisdictions, *see*

Birkeland Decl. ¶ 5(a) – was initially formed in 1993 by the director of an international legal studies institute in Austria, an individual named Dennis Campbell. *See* DC at 13-16, 29, 31-32. This network started with forty (40) or fifty (50) law firm members. *See id.* at 31-32. From the beginning, "GLOBALAW Limited" was designed as a way for law firm members to develop one-on-one personal relationships from which referral business could flow. *See id.* at 29-30. However, referrals by a U.S.-based member of GLOBALAW Limited do not necessarily provide the referring firm any instantaneous benefit, "either by way of new clients or fees." BSAI's Rule 26(c) Mot. for Protective Order at 22; 11/14/05 Kay Opinion at 21-22 (noting that C&C does not contest this point). BSAI, JW, and GSB began to use to term "GLOBALAW" in connection with this network when they entered into pre-2002 licensing agreements with Campbell. *See, e.g.*, Brown Decl., Ex. 2 (9/14/98 Understanding Between Campbell and BSAI); Birkeland Decl., Ex. 2 (1/18/94 Understanding Between Campbell and JW); Fernald Decl., Ex. 2 (2/14/01 Understanding Between Campbell and GSB).

All of the Law Firms (i.e., BSAI, JW, and GSB) have substantially the same sort of rights granted to them directly from Campbell as of the time they joined his fledgling organization. *See id.* Campbell affirmatively represented himself to be the "owner of the rights to the trademark 'GLOBALAW'" and he – by contract – explicitly granted each a license to use the mark. *See id.* On or about February 28, 2002, Campbell and GLOBALAW Limited signed a contract entitled the "Asset Transfer and Consulting Agreement," dated as effective January 1, 2002 (the "Asset Transfer Agreement"). *See* Birkeland Decl. ¶ 9 & Ex. 4 (Asset Transfer Agreement); *see also* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., Ex. 4 (same). Pursuant to the Asset Transfer Agreement, Campbell transferred to GLOBALAW Limited all rights associated with the

26

"Globalaw" mark worldwide, whether registered or not, and acknowledged that he in fact owned

such rights. *Id.* at § 6.2 ("Assignor is the sole owner of the Marks and Domain Names, and has

used the Marks and Domain Names exclusively in connection with the business and affairs of the

Globalaw association.").  Campbell also assigned all proprietary rights relating to the

www.globalaw.net website; all organization records, including those of U.S. members such as

BSAI, JW, and GSB; and all membership dues, including those of U.S. firms.  *Id.*  Among other

things, Campbell also agreed to assist with applications to register "GLOBALAW" in any

jurisdiction in the world where they are not now registered.  *Id.*

GLOBALAW Limited and its members – including Counterclaim Defendants BSAI, JW,

and GSB – have used the "GLOBALAW" mark since the Asset Transfer Agreement with the

belief that Campbell had transferred all rights he had in the "GLOBALAW" mark.  In their

respective depositions, both C. Baird Brown, on behalf of GLOBALAW Limited, and Campell

made clear that the Asset Transfer Agreement was the mechanism through which Campbell

transferred his rights in GLOBALAW and whereby GLOBALAW Limited acquired such rights.

*See* CBB at 48-49; DC at 149-50.  Besides the fact that U.S. law firms were involved, *see* DC at

58, it was obvious to Campbell that – under the Asset Transfer Agreement – he was transferring

to GLOBALAW Limited all rights he might have in the "GLOBALAW" name, *id.* at 58-59.[9]

---

[9] C&C focuses on the fact that Campbell, in a brief excerpt to his deposition, appears to claim that "[n]o rights in the United States to the service mark GLOBALAW were transferred to Globalaw Limited or anyone else by Dennis Campbell by the Assets Transfer Agreement or by any other document or act."  C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 15 (citing DCC at 163 (Campbell, in response to the question, "What assets in the United States or relating to the assets in the United States were transferred by that asset transfer?", responds "None.")). C&C uses this apparent testimony to assert that "Globalaw Limited never had acquired and did not have any rights to the mark in the United States" and contend that the Law Firms have used the GLOBALAW mark in the United States in "bad faith" after 2002 based on this alleged "lack

   b.  *What Have Been the Practical Contours of Counterclaim*
      *Defendants' "GLOBALAW, Limited" Since Its Inception?*

   Plaintiff and Counterclaim Defendant GLOBALAW Limited – which includes BSAI, JW,

and GSB – is an association of law firms that engage in relationships with each other.  *See*

Birkeland Decl. ¶ 8.  However, GLOBALAW Limited does not itself refer clients to its member

firms.  *Id.*  Unlike the alleged network of C&C's "GLOBALAW, Inc.," GLOBALAW Limited is

an actively functioning organization which ties its selected members together on a regular and

consistent basis.  At least four key differences exist between GLOBALAW Limited and the

evidence produced by C&C regarding its claimed, now-moribund "GLOBALAW, Inc."

   <u>First</u>, the member law firms of GLOBALAW Limited are listed and available to the

public on its website, <u>www.globalaw.net.</u>  *Id.* ¶ 5(a).  Reference to GLOBALAW Limited's

website, and the websites of its individual members, makes plain the substantial nature of the

size and capabilities of the firms operating under the "GLOBALAW Limited" umbrella.

---

of transfer."
   A review of further attached excerpts from both Campbell and Brown's testimony
undermines C&C's reading.  Rather, it is plain that Campbell was implying that he could not
definitively transfer his U.S.-based assets in the name "GLOBALAW" because C&C's
objections in 1996 before the TTAB ensured that those assets were still in dispute at the time the
Asset Transfer Agreement was signed in 2002.  Indeed, Campbell's multiple, pre-2002
agreements with numerous U.S. firms evince his belief – and those firms' justified assumption –
that Campbell had U.S. rights in the GLOBALAW mark.  Moreover, the Exhibit B to the Asset
Transfer Agreement plainly notes that "[t]here is no pending or prospective litigation involving
Globalaw *other than that relating to the Globalaw name in the United States*."  Birkeland Decl.,
Ex. 4 (Asset Transfer Agreement) at Ex. B ("Exceptions to Representations and Warranties")
(emphasis added).  Obviously, Campbell's pre-2002 assets in the United States could not be
definitively transferred to Counterclaim Defendants and listed as part of Exhibit A ("Transferred
Assets") of the 2002 Asset Transfer Agreement due to the fact that those U.S.-based "assets"
were encumbered and/or contingent upon certain legal findings.  However, Campbell certainly
passed on his interest in those supposed U.S.-based assets in 2002 to Counterclaim Defendants,
to the extent that such an interest actually exists.

GLOBALAW Limtied does not provide services to the public under the name "GLOBALAW," but instead under the name(s) of its individual members. *Id.* As a selection of the members' information from the website indicates, most firms consist of more than ten (10) lawyers, with a substantial number – particularly in the larger cities – being upwards of thirty (30) and sometimes over 100 lawyers. *Id.* Indeed, the vast bulk of the U.S. law firm members of GLOBALAW Limited have in excess of 100 lawyers, and no member of GLOBALAW Limited based in the continental United States has less than forty (40) lawyers. *Id.*

Second, membership in GLOBALAW Limited is not open to everyone, nor is it solicited by mass, anonymous mailings. *Id.* ¶ 5(b). Generally, a GLOBALAW Limited firm is selected to provide expertise in a specific geographic area. *Id.* Also, by choice, there is no GLOBALAW Limited member with its principal office in either New York City or New York State – the location of C&C. *Id.* Member firms do not provide services under the designation "GLOBALAW," in contrast to the way that C&C has often held itself out to the consuming public. Instead, they use it only to denote their membership in the GLOBALAW Limited network of firms. *Id.* Such a reference is always made in conjunction with the prominent use of their firms names. *Id.*

Third, GLOBALAW Limited is not merely a list of names of people who might (or might not) be able to provide legal services. *Id.* ¶ 5(c). Rather, it is also an active organization. *Id.* GLOBALAW Limited has a Board of Directors that holds meetings generally once a month, with most being by telephone conference, although at least one (1) meeting a year is in person. *Id.* There are annual regional meetings of network members in Europe, the Americas, and the Asia Pacific region, as well as one (1) annual meeting to which all network members are invited. *Id.*

29

Network members receive regular notice of meetings and network initiatives.  *Id.*  Moreover, members cannot merely be passive participants, and each member is required to appoint a representative and an alternate and is expected to attend the meetings.  *Id.*  Such active participation creates the personal relationships among members that are at the heart of the GLOBALAW Limited organization.  *Id.*

Fourth, and finally, the continental U.S. members of GLOBALAW Limited pay at least $7,000 in membership dues per year.  *Id.* ¶ 5(d).  These dues cover network expenses such as the cost for the third party currently retained to administer the GLOBALAW Limited network.  *Id.*[10] Among other things, the outside third party assists in setting up meetings and conferences, keeping up the website, and maintaining its professional appearance in keeping with the standards of the member firms.

     C.     *The History Leading Up to the Present Suit*

As previously noted, in November 1994, Campbell filed an application in the United States Patent and Trademark Office requesting federal registration of the service mark "GLOBALAW" for "association services."  *See* DC at 29; Birkeland Decl. ¶ 6.  Following Campbell's valid application, C&C filed a U.S. application for registration of the name "GLOBALAW" for "foreign and international legal services" on February 3, 1995.  *See* Birkeland Decl. ¶ 6; *see also* USPTO website, *available at* http://www.uspto.gov (wherein C&C, in Reg. No. 74629447, states that is registering the term under International Class 035, for "foreign and international legal services").  In addition, Haggai Carmon of C&C filed an

---

[10] A third party took over the administration function from Campbell in about 2002.  *See* CBB at 24-28, 67-72, 81-82.

opposition to Campbell's registration in 1996.  *See* DC at 42.  Discovery and various procedural events caused the proceeding before the TTAB to continue without resolution through about 2001; these proceedings have subsequently been stayed pending the resolution of this suit.  *See* Birkeland Decl. ¶ 6.

While the TTAB proceedings dragged on, GLOBALAW Limited – on behalf of its member firms – brought suit in this Court for declaratory relief in April 2003, seeking a judgment that it was the rightful owner of the mark.  *See* Compl. ¶¶ 19-20.  C&C and GLOBALAW, Inc. countersued GLOBALAW Limited, BSAI, JW, and GSB in January 2004, leading to the present dispute.  *See* C&C's Counterclaim ¶ 38.  C&C's Counterclaim – which contends that it actually is the senior user of the relevant mark – alleges four separate alleged violations that are now the subject of Counterclaim Defendants' Motion for Summary Judgment: (1) trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1141(1), *see id.* ¶¶ 54-57 (Count I); (2) trademark infringement, false designation of origin, passing off, and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), *see id.* ¶¶ 58-61 (Count II); (3) false and misleading statements of fact under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), *see id.* ¶¶ 59-65 (Count III); and (4) common law trademark infringement, unfair competition, and misappropriation, *see id.* ¶¶ 66-69 (Count IV).

## II: LEGAL STANDARDS

A.    *Motion For Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c)*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Counterclaim Defendants, as the

moving party, bear the "initial responsibility of informing the district court of the basis for [its]

motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence

of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986).  C&C, in response to the Counterclaim Defendants' motion, must "go

beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and

admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.*

at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.*

*Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead,

while the movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587,

106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

"Summary judgment may be granted in trademark matters where there is no protectable

trademark interest and no likelihood of confusion." *Info. Superhighway, Inc. v. Talk Am., Inc.*,

395 F. Supp. 2d 44, 50 (S.D.N.Y. 2005) (citations omitted); *see also Frosty Treats Inc. v. Sony*

*Computer Entm't Am., Inc.*, 75 U.S.P.Q.2d 1570, 1572 (8th Cir. 2005) (affirming summary

judgment that "Frosty Treats" was not a protectable mark because it was descriptive "at best" and

there was "no basis for concluding that it has acquired secondary meaning"); *Packman v.*

*Chicago Tribune Co.*, 267 F.3d 628, 646 (7th Cir. 2001) (affirming summary judgment because

there was no likelihood of confusion); *Davis v. Walt Disney Co.*, 75 U.S.P.Q.2d 1044, 1048-50

(D. Minn. 2005) (granting summary judgment on the bases that the "minimal, sporadic evidence

of Plaintiffs' use . . ., as a matter of law, is not sufficient to establish that the mark 'conjures up a

particular service or product in the minds of customers'" and that "even if Plaintiffs had a valid

registered or common law trademark . . . no likelihood of confusion exists as a matter of law")

(citation omitted); *Johnson v. Auto. Ventures, Inc.*, 890 F. Supp. 507, 516-17 (W.D. Va. 1995)

(granting summary judgment on the basis that the plaintiff failed to meet "the 'vigorous

evidentiary requirements' as to secondary meaning" and that, even if the mark were entitled to

protection, there was no likelihood of confusion).

> B.      *Motion for a Continuance and Further Discovery Pursuant to Federal Rule of*
> *Civil Procedure 56(f)*

Summary judgment "ordinarily 'is proper only after the plaintiff has been given adequate

time for discovery.'" *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir.

1997) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)).

Under Rule 56(f), a court "may deny a motion for summary judgment or order a continuance to

permit discovery if the party opposing the motion adequately explains why, at that timepoint, it

cannot present by affidavit facts needed to defeat the motion." *Strang v. United States Arms*

*Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989); *Londrigan v. Fed. Bureau*

*of Investigation*, 670 F.2d 1164, 1175 (D.C. Cir. 1981).  "[T]he purpose of Rule 56(f) is to

prevent 'railroading' the non-moving party through a premature motion for summary judgment

before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole*

*Foods Market Group, Inc.*, Civ. No. 01-1054, 2003 WL 21486821, at *2 n.5 (D.D.C. Mar. 18,

2003) (citing *Celotex Corp.*, 477 U.S. at 326, 106 S.Ct. 2548).  The district court has discretion

in determining whether it should permit additional discovery before the motion for summary

judgment is resolved.  *Stella v. Mineta*, 284 F.3d 135, 147 (D.C. Cir. 2002).  Accordingly, upon

appeal, the district court's refusal to allow further discovery is reviewed for abuse of discretion.

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1033 (D.C. Cir.

2003); *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 28 (D.C. Cir. 1997).

A party seeking the protection of Rule 56(f) "must state by affidavit the reasons why he is unable to present the necessary opposing material." *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington*, 699 F.2d 1274, 1278 n.6 (D.C. Cir. 1983); *but see First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988) (holding that filing an affidavit is not essential to preserve Rule 56(f) contention as long as the district court was alerted to the need for further discovery). In this case, counsel for C&C has attached a Rule 56(f) affidavit, *see* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., Ex. 15 (Decl. of John C. Lowe, counsel for C&C) ¶¶ 3, 5. The party seeking additional discovery bears the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the motion. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 248 N.8 (D.C. Cir. 1999). It must also show a reasonable basis to suggest that discovery might reveal triable issues of fact. *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999).

### III: DISCUSSION

In its discussion of the present motions, the Court shall address: (1) Count I of C&C's Counterclaim, which alleges that Counterclaim Defendants – in their use of the service mark "GLOBALAW" – have committed trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1141(1); (2) Count II and IV of C&C's Counterclaim, which allege trademark infringement, false designation of origin, passing off, and unfair competition in violation of both Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the common law; and (3) Count III of C&C's Counterclaim, which alleges that Counterclaim Defendants have contravened Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), through false

and misleading statements of fact.  Following the Court's analysis of C&C's claims in the

context of Counterclaim Defendants' Motion for Summary Judgment, the Court shall then turn to

an analysis of C&C's Motion for Further Discovery Pursuant to Federal Rule of Civil Procedure

56(f) and its Motion to Reconsider the November 14, 2005 Opinion and Order of Magistrate

Judge Alan Kay in order to determine whether these two motions affect and/or temporarily save

C&C's claims.

A.      *Count I of C&C's Counterclaim – Trademark Infringement Pursuant to Section
        32(1) of the Lanham Act*

Count I of C&C's Counterclaim against Counterclaim Defendants GLOBALAW Limited,

BSAI, JW, and GSB contends that "Counterclaim defendants use of the Mark, 'Globalaw,' is

likely to cause confusion, mistake, or deception of the public as to the source, sponsorship, or

approval of those services provided by them in violation of Section 32(1) of the Lanham Act, 15

U.S.C. § 1114(1)."  C&C's Counterclaim ¶ 55.  Section 32(1) is part of the broader Lanham Act,

which "protects registered marks from interference by state legislation, prevents unfair

competition, and protects against fraud 'by the use of reproductions, copies, counterfeits, or

colorable imitations of registered marks.'"  *Packman*, 267 F.3d at 638 (quoting 15 U.S.C. § 1127;

citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)).  Pursuant to

these goals, the Lanham Act provides for the registration of trademarks, which it defines in

Section 45 to include "any word, name, symbol, or device, or any combination thereof [used or

intended to be used] to identify and distinguish [a producer's goods] . . . from those

manufactured or sold by others and to indicate the source of the goods . . . ."  15 U.S.C. § 1127.

The Lanham Act also protects service marks, such as the mark GLOBALAW at issue in this

36

case, which constitute "any word, name, symbol, or device, or any combination thereof – used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." *Id.*; *see Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 855 (3d Cir. 1992) (case law referring to "trademarks" is equally applicable to service marks, since "the terms are often used interchangeably" and they "are entitled to the same legal protection"); 1 *McCarthy on Trademarks & Unfair Competition* § 4:14 (noting that, for practical purposes, trademarks, trade names and service marks "are subject to the same substantive rules of validity and infringement").

Section 32(1) of the Lanham Act, which is the basis for Count I of C&C's Counterclaim, provides, *inter alia*:

> Any person who shall, without the consent of the *registrant* –
>
>> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a *registered* mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>>
>> (b) reproduce, counterfeit, copy, or colorably imitate a *registered* mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action *by the registrant* for the remedies hereinafter provided.

15 U.S.C. § 1114(1) (emphasis added).  Accordingly, by its very text, a Section 32(1) claim –

unlike a Section 43 claim – contemplates that a "registration" has occurred and that a "registrant" is seeking certain remedies.  *Cf. Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) ("Registration of a mark under § 2 of the Lanham Act, 15 U.S.C. § 1052, enables the owner to sue an infringer under § 32 . . . .").  Here, neither C&C nor Counterclaim Defendants hold a mark in "GLOBALAW" that has been successfully registered on the United States Principal Register of Trademarks, a fact that C&C in its Opposition does not dispute.  *See* Countercl. Defs.' Reply in Supp. of Countercl. Defs.' Mot. for Summ. J. at 1 n.1.  As noted previously, such registration before the TTAB remains highly contested, with proceedings stayed pending the resolution of this case.  Absent a complete and successful registration, C&C is not a "registrant" under the parameters of Section 32(1) and cannot bring a claim pursuant to that section at this time.  As such, Counterclaim Defendants' Motion for Summary Judgment must be granted with respect to Count I of C&C's Counterclaim.

B.      *Counts II and IV of C&C's Counterclaim – Trademark Infringement, False Designation of Origin, Passing Off, and Unfair Competition under Section 43(a) of the Lanham Act and the Common Law*

Count II of C&C's Counterclaim contends that

Counterclaim defendants' advertisement that they are the owners of the Service Mark, "Globalaw," and have rights in the Mark and their use of the Mark to advertise and promote their legal services are likely [sic] to cause confusion, mistake, or deception as to the origin, sponsorship or approval of their services and activities, and thus constitute [sic] trademark infringement, false designation of origin, passing off, and unfair competition in violation of Section [43(a)] of the Lanham Act, 15 U.S.C. § 1125(a)(1).

C&C's Counterclaim ¶ 59.  Unlike Section 32(1), Section 43(a) does not require registration of the mark on the United States Principal Register of Trademarks.  *See Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington-DC, Maryland y Virginia v.*

38

"*Partido Revolucionario Dominicano, Seccional de Maryland y Virginia*," 312 F. Supp. 2d 1, 11

(D.D.C. 2004 ) (hereinafter, "*PRD*") (noting that "[w]hen a tradename is not registered on the

United States Principal Register of Trademarks, it can nonetheless benefit from Lanham Act

protection" under Section 43); *Duggal v. Krishna*, 554 F. Supp. 1043, 1044 n.4 (D.D.C. 1983)

("The Lanham Act's proscription of unfair competition . . . is available to the owner of an

unregistered mark."); *see also Sklar*, 967 F.2d at 855 ("Section 43(a) of the Lanham Act 'extends

protection to unregistered trademarks on the principle that unlicensed use of a designation

serving the function of a registered mark constitutes a false designation of origin and a false

description of representation.'") (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d

Cir. 1986)).  Section 43(a) of the Lanham Act provides, in relevant part, as follows:

> Any person who, in connection with any goods or services . . . uses in commerce
> any word, term, name, symbol, or device, or any combination thereof . . . which –
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
>> affiliation, connection, or association of such person with another person,
>> or as to the origin, sponsorship, or approval of his or her goods, services,
>> or commercial activities by another person . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Count IV of C&C's Counterclaim brings a similar claim for "trademark infringement,

unfair competition, and misappropriation" under common law.  *See* C&C's Counterclaim ¶ 67.

A grouping of these two counts for the purposes of Counterclaim Defendants' Motion for

Summary Judgment is in order, as "[t]he elements of common law trademark or service mark

infringement are similar to those required to prove unfair competition under § 43(a) of the

Lanham Act." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004); *see also*

*Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) ("The

heart of a successful claim based upon . . . the Lanham Act . . . and common law trademark

infringement is the showing of likelihood of confusion as to the source of sponsorship of

defendant's products."); *Info. Superhighway, Inc.*, 395 F. Supp. 2d at 56 ("[t]he elements

necessary to prevail on common law infringement and unfair competition mirror Lanham Act

claims") (citations omitted).

      While Counts II and IV may appear to internally allege many different grievances – i.e.,

trademark infringement, false designation of origin, passing off, and unfair competition – courts

have announced that the elements for each of the aforementioned causes-of-action mirror those

for a claim of trademark infringement.  *See PRD*, 312 F. Supp. 2d at 11 ("The analysis for unfair

competition under Section 43(a) of the Lanham Act is essentially the same as the analysis for

trademark infringement."); *Am. Ass'n for Advancement of Science v. Heart Corp.*, 498 F. Supp.

244, 261-62 (D.D.C. 1980) (noting that "the essential elements are the same for either a

trademark infringement or unfair competition action" and "the remedy for unfair competition,

injunctive relief, is the same as that provided by the infringement law"); *see also Tommy Hilfiger

Licensing, Inc. v. Goody's Family Clothing, Inc.*, Civ. A. No. 00-1934(BBM), 2003 WL

22331254, at *30 n.5 (N.D. Ga. May 9, 2003) ("the standards for the federal claims of false

designation of origin and unfair competition are the same as those for trademark infringement")

(citations omitted).

      To prevail on a claim of trademark infringement in the D.C. Circuit, "the plaintiff must

show (1) that it owns a valid trademark, (2) that its trademark is distinctive or has acquired a

secondary meaning, and (3) that there is a substantial likelihood of confusion between the

plaintiff's mark and the alleged infringer's mark." *Malarkey-Taylor Assocs., Inc. v. Cellular*

*Telecomm. Indus. Ass'n*, 929 F. Supp. 473, 476 (D.D.C. 1996) (citing *Sears, Roebuck and Co. v.*

*Sears Fin. Network*, 576 F. Supp. 857, 861 (D.D.C. 1983)); *see also PRD*, 312 F. Supp. 2d at 11

(same); *Duggal*, 554 F. Supp. at 1044 (same); *Hearst*, 498 F. Supp. at 254 (same).  Pursuant to

this three-pronged analysis, the Court shall evaluate C&C's Section 43(a) and common law

trademark infringement claims.

1.    Does C&C Own a Valid Service Mark?

a.    *Is C&C the "Senior User" of the Mark?*

C&C's trademark infringement claims against the Counterclaim Defendants – i.e.,

GLOBALAW Limited, BSAI, JW, and GSB – arise out of its contention that it is the senior user

of the GLOBALAW mark, having used the service mark since 1987 or 1988, *see* 5/20/05

Rakeffet Carmon Aff. ¶¶ 4-5, while Counterclaim Defendants have employed the mark since

only 1993 or 1994, *see* DC at 13-16, 29, 31-32.  Ownership via use of the mark is a fundamental

issue, as it is necessary to identify – as between competing users – who is the senior and junior

user.  *See Laurel Capital Group, Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 481 (W.D. Pa. 1999)

(citing *ACCU Personnel Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1204 n.12 (D.Del. 1994)).

The "senior user" is typically the first to use the mark anywhere in the United States.  *Id.*; *see*

*also* 4 *McCarthy on Trademarks & Unfair Competition* § 26.5.  In the ordinary case of parties

competing under the same mark in the same market, it is correct to say that prior appropriation

settles the initial question of ownership, and that the service mark rights of the senior user trump

those of the junior user.  *Id.*  "In the absence of a registered trademark, the Court assesses the

factual circumstances from which the claims arise in order to determine whether the party

claiming infringement or unfair competition has a cognizable interest in the mark or name in

question." *PRD*, 312 F. Supp. 2d at 12 (citing *Duggal*, 554 F. Supp. at 1047 (where the mark in

dispute was the name of a periodical, the court conducted an inquiry as to which party owner the

periodical)).

      Here, according to the unsupported affidavits of both Rakeffet and Haggai Carmon and

Eugene Lemay, one of their earliest customers, C&C began using the mark "GLOBALAW" in

connection with its legal services as early as 1987.  *See* 5/20/05 Rakeffet Carmon Aff. ¶ 5

("Carmon commenced using the mark GLOBALAW in interstate commerce as early as 1987.");

11/28/05 Haggai Carmon Aff. ¶ 1 ("I invented or created the word Globalaw in 1987 to identify

the legal services my wife and I would provide in our partnership, Carmon & Carmon."); *see also*

C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., Ex. 13 (Decl. of Eugue Lemay, head of a

NY/NJ storage and moving company that has used C&C's services) (undated) ¶ 2 ("I have been

using the professional legal services of Rakeffet Carmon, Esq., of the law firm of Carmon &

Carmon-GLOBALAW since 1987.").  In contrast, Counterclaim Defendants did not use the mark

"GLOBALAW" until 1993; however, Counterclaim Defendants were the first to file a valid

application in the United States Patent and Trademark Office requesting federal registration of

the service mark "GLOBALAW" for "association services."  *See* DC at 29; Birkeland Decl. ¶ 6

(noting that Counterclaim Defendants filed a successful application before the USPTO in

November 1994); *see also* Birkeland Decl. ¶ 6 (C&C did not file a technically valid application

until February 1995); *see also* USPTO website, *available at* http://www.uspto.gov (wherein

C&C, in Reg. No. 74629447, states that is registering the term under International Class 035, for

"foreign and international legal services").

Ultimately, as noted previously, major problems exist with the "evidence" put forth by C&C to support its claim to "senior" use.[11]  Indeed, in light the entire lack of competent evidence indicating pre-1994 use by C&C in the summary judgment record, the Court could grant summary judgment in favor of Counterclaim Defendants as to all counts, as C&C has not put

---

[11] In addition to the problems touched on previously, it is worth noting that the Lemay Affidavit is not dated, in violation of 28 U.S.C. § 1746, and does not state that the statements therein are "true and correct," as instructed by 28 U.S.C. § 1746 as well.  Moreover, the 11/28/05 Haggai Carmon Affidavit and the 5/20/05 Rakeffet Carmon Affidavit are entirely conclusory, supported by no evidence within the record; as such, they fall under the kind of affidavit typically insufficient to avoid summary judgment.  *See Johnson v. U.S. Capitol Police Bd.*, Civ. No. 03-614 (HHK), 2005 WL 486743, at *2 (D.D.C. Mar. 2, 2005) (finding that an affidavit submitted in opposition to a summary judgment motion did not meet the standard under Rule 56 because it was "unsupported by any record evidence"); *Hastie v. Henderson*, 121 F. Supp. 2d 72, 81 (D.D.C. 2000), *aff'd sub. nom.*, *Hastie v. Potter*, Civ. No. 00-5423, 2001 WL 793715, at *1 (D.C. Cir. June 28, 2001) (no genuine issue of material fact where sole evidence plaintiff provided was "her own self-serving and conclusory statement");  *Phillips v. Holladay Prop. Serv., Inc.*, 937 F. Supp. 32, 35 n.2 (D.D.C. 1996), *aff'd*, 1997 WL 411695 (D.C. Cir. 1997) ("[A] plaintiff's denial . . . without producing substantiation for the denial is insufficient to withstand a motion for summary judgment."); *Matthews v. Hesburgh*, 504 F. Supp. 108, 114 n.16 (D.D.C. 1980) ("Mere allegations even in an affidavit, unsupported by specific facts, are insufficient to resist a motion for summary judgment."), *aff'd*, 672 F.2d 895 (D.C. Cir. 1981).  The Eleventh Circuit has specifically rejected these kinds of affidavits in support of a trademark infringement claim, noting in *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210 (11th Cir. 2000), that the plaintiff's affidavit:

> is little more than a brief, conclusory allegation of trademark usage.  It asserts that [the plaintiff] has used the photograph to promote his work since May 1994 and it mentions the Southern Images Gallery by name, but it is devoid of any other detail.  "This court has consistently held that conclusory allegations without specific supporting facts have no probative value." . . . [The plaintiff] has the burden of proving he has trademark rights in the Bird Girl photograph . . . . [I]n response to the defendant's motion for summary judgment, he did not provide any "specific facts" supporting prior use sufficient to create a genuine issue for trial.

*Id.* at 1217 (internal citations omitted).  Given these failings, it is entirely unclear whether C&C's assertion that it was the "senior user" of the GLOBALAW mark could withstand a summary judgment challenge.

forth specific facts supporting prior use with any degree of substantiation.  However, even

assuming *arguendo* that C&C was the "senior user" and that C&C's problematic affidavits are

accurate, C&C's claims ultimately fail.  Given the importance and length of this litigation, the

Court shall not tether its dismissal to a *Leigh*-styled rejection of C&C's claims.  *Accord Leigh v.*

*Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).  Instead, the Court shall continue

through the entire analysis and shall assume *arguendo* solely for the purposes of this motion that

C&C was actually the "senior user" of the GLOBALAW service mark within the United States.

> b. *Is the Mark "GLOBALAW" Generic and Therefore Ineligible for*
> *Trademark Protection?*

However, "senior use" of a mark alone is insufficient to confer trademark protection.

Rather, "[t]he existence and extent of trademark protection for a particular term depends on that

term's inherent distinctiveness." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872

F.2d 1035, 1039 (D.C. Cir. 1989); *see also Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455,

464 (4th Cir. 1996) (recognizing that "[t]he protection accorded trademarks is directly related to

the mark's distinctiveness").  "To be protectable, 'a mark must be capable of distinguishing the

products [or services] it marks from those of others.'" *Donchez*, 392 F.3d at 1216 (quoting *Lane*

*Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 34 (2d Cir. 1999)).  "Courts have

identified four general categories of terms:  (1) generic, (20 descriptive, (3) suggestive, and (4)

arbitrary or fanciful." *Blinded Veterans Ass'n*, 872 F.2d at 1039.  These categories may be

described in roughly the following manner:

> A mark is **generic** if it is a common description of products [or services] and
> refers to the genus of which the particular product [or service] is a species.  A
> mark is **descriptive** if it describes the product's [or service's] features, qualities,
> or ingredients in ordinary language or describes the use to which the product [or

> service] is put.  A mark is **suggestive** if it merely suggests the features of the
> product [or service], requiring the purchaser to use imagination, thought, and
> perception to reach a conclusion as to the nature of the goods [or services].  An
> **arbitrary** mark applies a common word in an unfamiliar way.  A **fanciful** mark is
> not a real word at all, but is invented for its use as a mark.

*Donchez*, 392 F.2d at 1216 (quoting *Lane Capital Mgmt.*, 192 F.3d at 344) (emphasis added).

These categories "reflect both the eligiblity for protection and the degree of protection

accorded" a particular mark.  *Id.*  However, as this Circuit has recognized,

> [t]hese categories, like tones in a spectrum, tend to blur at the edges and merge
> together.  The labels are more advisory than definitional, more like guidelines
> than pigeonholes.  Not surprisingly, they are somewhat difficult to articulate and
> to apply.

*Blinded Veterans Ass'n*, 872 F.2d at 1039 (quoting *Zatarains, Inc. v. Oak Grove Smokehouse,*

*Inc.*, 698 F.2d 786, 790 (5th Cir. 1983)).  Importantly, the categorization of a mark is a factual

question.  *See Donchez*, 392 F.3d at 1216 (citing *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d

210, 215 (2d Cir. 2003); *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 992

(7th Cir. 1989); *Anheuser-Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 633 (8th Cir. 1984)).

"[T]he fact-finder's own perception of the mark is not the object of the inquiry."  *Lane Capital*

*Mgmt.*, 192 F.3d at 344.  Instead, "the fact-finder's function is to determine, based on the

evidence before it, what the perception of the purchasing public is."  *Id.*; *see also Bayer Co. v.*

*United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921) (L. Hand, J.) ("The single question, as I view

it, in all these cases, is merely one of fact:  What do the buyers understand by the word for whose

use the parties are contending?").

The correct categorization of a mark at issue is extremely significant, because "[i]f a term

is generic (the common name for a product or service), it is ineligible for protection" because

"[t]he public has an inherent right to call a product or service by its generic name." *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 523 (4th Cir. 2002); *Blinded Veterans Ass'n*, 872 F.2d at 1040 ("The threshold issue for this court is whether 'blinded veterans' is generic, and therefore unprotectable as a trademark . . . ."). In contrast, "fanciful," "arbitrary," and "suggestive" marks are inherently distinctive, and therefore receive the greatest protection against infringement. *See Sara Lee Corp.*, 81 F.3d at 464; 1 *McCarthy on Trademarks & Unfair Competition* § 11.01[1]. "A descriptive mark may be eligible for protection, but only if it has acquired a 'secondary meaning' in the minds of the public." *U.S. Search*, 300 F.3d at 523; *see also Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 851 n.11, 102 S.Ct. 2182, 72 l.Ed.2d 606 (1982) (marks that are merely descriptive are accorded protection only if they have acquired a "secondary meaning," that is, if "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself"); *Malarkey-Taylor Assocs.*, 929 F. Supp. at 476 (same).

Because "GLOBALAW" is not presently a registered trademark, the burden is on C&C as the Counterclaim Plaintiff to prove that the term is not generic. *See Blinded Veterans Ass'n*, 872 F.2d at 1041 (citing *Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980); *McCarthy on Trademarks & Unfair Competition* § 12:2); *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir. 2000) (absent registration, the presumption is that the term is generic); *cf. Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1324 (D. Kan. 2005) (noting that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather the movant need simply point out to the court a lack of evidence for the other party on an essential element of that

46

party's claim").  The D.C. Circuit has described a generic term as follows:

> A generic term is one commonly used to denote a product or other item or entity, one that indicates the thing itself, rather than any particular feature or exemplification of it. . . . A generic term does not merely identify a particular characteristic or quality of some thing; it "connotes the 'basic nature'" of that thing. . . . Because a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain; it therefore is not afforded trademark protection even if it becomes associated with only one source.

*Blinded Veterans Ass'n*, 872 F.2d at 1039 (internal citations omitted); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997) ("A generic mark is generally a common description of goods, one that refers, or has come to be understood as referring, to the genus of which the particular product is a species.").  While the terms both "global" and "law" are clearly generic terms, "[w]ords which could not individually become a trademark may become one when taken together."  *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 379 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) (cited favorably by *Blinded Veterans Ass'n*, 872 F.2d at 1041); *see also Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir. 1986) (noting that "[d]issecting marks often leads to error") (citation omitted); *McCarthy on Trademarks & Unfair Competition* § 11:10 ("The validity of a mark must be determined by looking at the mark as a whole.  A composite mark should not be fragmented into its various pieces."); *but see Nat'l Conf. of Bar Exam'rs v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir. 1982) (stating that "if the components of a trade name are common descriptive terms, a combination of such terms retains that quality").

Accordingly, the Court must apply the relevant test to determine whether the composite term "GLOBALAW" is – in fact – generic, or whether it deserves some level of protection as a service mark.  In this Circuit, "the test for genericness is whether the public perceives the term

primarily as the designation of the article." *Blinded Veterans Ass'n*, 872 F.2d at 1041 (citing

*McCarthy on Trademarks & Unfair Competition* § 12:2).   Under the "primary significance test,"

"a plaintiff seeking to establish a valid trademark 'must show that the primary significance of the

term in the minds of the consuming public is not the product but the producer.'" *Genesee*

*Brewing Co.*, 124 F.3d at 144 (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118, 59

S.Ct. 109, 83 L.Ed. 73 (1938)); *see also* The Trademark Clarification Act of 1984, Pub. L. No.

98-620, § 102, 98 Stat. 3335 (codified at 15 U.S.C. § 1064) (adopting the "primary significance

test").   "'[A] mark is not generic merely because it has *some* significance to the public as an

indication of the nature or class of an article.   In order to become generic the *principal*

significance of the word must be its indication of the nature or class of an article, rather than an

indication of its origin.'" *Id.* (quoting *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d

577, 580 (2d Cir. 1963) (citation and internal quotation marks omitted)).   Evidence of buyers'

understanding may come from competitors' use of the mark, plaintiff's use of the mark,

dictionary definitions, testimony of consumers or consumer surveys, and media usage.   *See*

*Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 641 (Fed. Cir. 1991); *In re Northland Aluminum*

*Prods., Inc.*, 777 F.2d 1556, 1559 (Fed. Cir. 1985); *McCarthy on Trademarks & Unfair*

*Competition* § 12:13.

      i.      <u>Evidence Supporting the Conclusion that "GLOBALAW"</u>
              <u>is Generic</u>

In applying the "primary significance" test in order to determine whether a term is

generic, courts have often applied the "who-are-you/what-are-you" test – i.e., "A mark answers

the buyers questions 'Who are you?'  'Where do you come from?'  'Who vouches for you?'  But

the generic name of the product answers the question 'What are you?'" *Official Airline Guides,*

*Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting 1 *McCarthy on Trademarks & Unfair*

*Competition* § 12.01)); *see also Golf Warehouse, L.L.C. v. Golfers' Warehouse, Inc.*, 142 F.

Supp. 2d 1307, 1310 (D. Kan. 2001) (same).  Counterclaim Defendants assert that

"GLOBALAW" falls into the generic category because it answers the question "What are you?"

*See* Countercl. Defs.' Mot. for Summ. J. at 17.  Counterclaim Defendants GLOBALAW Limited,

BSAI, JW, and GSB cite three strong pieces of evidence to support their contention that C&C's

trademark infringement claims under Section 43(a) and the common law must fail due to the

generic nature of the mark.

    First, a search of the Internet through the "Google" search engine reveals the following

examples of the widespread use of the term(s) "Globalaw" and "Global Law":

    <u>Use By Law Firms</u>

- Skadden Arps is the "Global Law Firm of the Year," *at*
  http://www.chambersandpartners.com/globalawards/index.cfm?id=38&show=4.

- Clifford Chance, a "truly integrated global law firm," *at*
  <u>http://www.cliffordchance.com/home/default.aspx.</u>

- Orrick Herrington, a "Global Law Firm," *at* <u>http://www.orrick.com/.</u>

- White & Case, a "Global Law Firm," *at* <u>http://www.whitecase.com/.</u>

- The "Global Law Firm" of Shearman & Sterling, *at*
  <u>http://www.shearman.com/flashindex.html.</u>

- The "global law firm" of Baker & McKenzie, *at*
  http://www.bakernet.com/BakerNet/Firm+Profile/Welcome/default.htm.

- Cooley Godward's "Global Law Practice Group," *at*
  http://www.cooley.com/practices/detail.aspx?practiceid=37412220.

- Stikeman Elliott LLP is "Canada's Global Law Firm," with an office located in New York, New York, *at* http://www.stikeman.com/.

Use By Law Schools

- New York University's "Hauser Global Law School Program" (whose slogan is "Global Law & Justice"), *at* http://www,nyulawglobal.org/.

- University of Richmond's *Journal of Global Law & Business*, *at* http://www.student.richmond.edu/~rjglb/.

- Georgetown Law School's "Global Law Scholars," *at* http://www.law.georgetown.edu/gls/.

- Chicago-Kent College of Law's "Global Law and Policy Initiative (GLAPI)," *at* http://www.kentlaw.edu/international/glapi/.

- Syracuse University College of Law's "Center for Global Law & Practice" (defining "Global Law" as consisting of "the knowledge and skills that a law school graduate needs to acquire in order to work . . . in the 21st century"), *at* http://www.law.syr.edu/academics/centers/glap/mission.asp.

- Duke University's "Global Law Workshop," *at* http://www.law.duke.edu/internat/speakers.html.

- Southern Methodist University, "A Global Law School for the Metroplex," *at* http://www.law.smu.edu/lia/html/History/a_global_law_school.htm.

Other Uses

- Thomson publishes *Globalaw Quarterly*, *available at* http://www.westthomson.com/pdf/GlobalLaw/GQ_Q2_05.pdf.

- Volume I of the *Global Law Firms Directory* can be purchased through Forbes' Book Club, *at* http://www.forbesbookclub.com/bookpage.asp?prod_cd=IKU8W.

- The State Capital Global Law Firm Group, *at* http://www.statecapitallaw.org/, of which the law firm of Kegler Brown is a member, *at* http://www.keglerbrown.com/aboutus/statecapital.asp.

- Global Law Association, *at* http://www.angelfire.com/biz/GLA/, which was supposedly founded in the late 1980s.

- The "Global Law Sources" of various countries complied by The Legal and Legislative Resource Center, *at* http://www.lpig.org/itlaw.html.

*See* Chotvacs Decl. ¶ 2, Exs. A-T.

Second, the unrebutted opinions and conclusions of Counterclaim Defendants' expert,

David J. Kera of Oblon Spivak McClelland Maier and Neustadt, PC, support the generic nature

of the term "GLOBALAW."  In his expert report, Mr. Kera observed:

> On the basis of the information in the results of the GOOGLE searches on "globalaw" and "global law"; the use of GlobaLaw Quarterly as the name of a publication dealing with international legal issues published by Thompson [sic], a company unrelated to any of the parties in this litigation; the definition of "global" in Webster's Third International Dictionary and the meaning of the word "law" in relation to the professional practice of Carmon and Carmon and the firms which constitute the membership of Globalaw Limited; and the decisions and opinions in *Blinded Veterans*, *American Fertility Society and Gould Paper Corporation*, it is my opinion that "globalaw" is a common noun or generic term which is synonymous with "international law" and refers to the practice of law in different countries.

Countercl. Defs.' Mot. for Summ. J., Ex. 11 (4/25/2005 Expert Report of David J. Kera) at 6

(hereinafter, "Kera Report"), and accompanying deposition excerpts (DK 1-8, 18-22, 31-34, 38,

57-58, 65).

Third, the unrebutted opinions and conclusions of Counterclaim Defendants' expert,

Joseph M. Ridgway of Bruno and Ridgway Research Associates, Inc., who conducted a

GLOBALAW Recognition Survey, also support categorizing "GLOBALAW" as a generic term.

*See* Countercl. Defs.' Mot. for Summ. J., Ex. 12 (4/20/05 Expert Report of Joseph M. Ridgway)

(hereinafter, "Recognition Survey"), and accompanying deposition excerpts (JR 1-6, 55-56, 151-

52).  The Recognition Survey was conducted among lawyers who are involved in the practice of

international law to measure: "(a) Their perception of the meaning of GLOBALAW; (b) What

51

awareness there is, if any, of ways in which the word, term, or phrase GLOBALAW has been

used; and (c) What awareness there is, if any, of how and by whom GLOBALAW has been

used."  Recognition Survey at 1.  Lawyers in six (6) geographic markets within the United States

– including where C&C has its sole office, where BSAI has its home office, where JW has an

office, and where GSB has its home office – were randomly selected from the Martindale-

Hubbell Law Directory.  *Id.*  As part of the survey, the lawyers questioned were shown the term

GLOBALAW, and then asked questions relating to what it meant to them.  *Id.* at 2-3.  Over the

course of the survey, sixty-six (66) lawyers participated.  *Id.* at 3.

The GLOBALAW Recognition Survey demonstrates that consumers view the term

"Globalaw" as connoting the basic nature of the services being offered by C&C and

Counterclaim Defendants under the term, and that the primary significance of the term is *the*

*services themselves*, *not any one offeror of services*, and certainly not C&C.  *See generally*

Recognition Survey.  Of the sixty-six (66) lawyers that participated in the survey, only forty-

seven (47) ascribed *any* meaning to the term "Globalaw."  *Id.* at 4-5.  The primary significance of

the term attributed to them by the lawyers responding was that the term "Globalaw" was a type of

law.  *Id.* at 5.  For instance, in answering the question, "What, if anything, does GLOBALAW

mean to you?," lawyers' responses included the following:

| | |
|---|---|
| Respondent #7: | "Private or public international law." |
| Respondent #9: | "It means laws that are effective not only in the U.S. but all countries." |
| Respondent #13: | "International law, law from around the world." |
| Respondent #15: | "International law." |
| Respondent #25: | "It means a related set of laws that apply internationally and don't stop at a country's boundary." |
| Respondent #28: | "World wide law throughout the world." |
| Respondent #34: | "International law." |

| | |
|---|---|
| <u>Respondent #40:</u> | "I'm an international trade practitioner so it means international law." |
| <u>Respondent #44:</u> | "I think it's a new term for international law." |
| <u>Respondent #58:</u> | "It means world wide law." |

*See id.* at Appendix, Answers to Question 3a.

ii.    <u>C&C's Attempt to Meet Its Burden to Prove that "GLOBALAW" is Not Generic</u>

In response to Counterclaim Defendants' evidence supporting the conclusion that "GLOBALAW" is a generic term, and therefore unprotectable, C&C offers five central arguments. Upon a review, each of these arguments is ultimately flawed.

First, C&C focuses on the fact that Dennis Campbell, in November 1994, filed an application to register the service mark "GLOBALAW Limited" – an application which, while not yet successful, was approved by the trademark examiner at the Patent and Trademark Office for publication in the *Official Gazette*. *See* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 23. Problematically for C&C's position is that publication alone is not determinative of the issue of the term's classification or general protectability.[12] This is especially true in a case such as this, in which the record has been fully developed in the district court. As the Third Circuit has emphasized, "[a]lthough an initial PTO determination by an examining attorney may be considered, it need not be given weight when the PTO attorney did not review all the evidence available to the District Court." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237

---

[12] As the Third Circuit has noted, "[p]ublication of a mark is not equivalent to its allowance or registration; the PTO issues a Certificate of Registration only if 'all oppositions filed' after publication are dismissed. 37 C.F.R. § 2.81. Reference to PTO action is more naturally understood as allowance (or denial) of an application rather than publication of a mark, especially where an opposition is filed." Kos Pharm., Inc. v. Andrx Corp. 369 F.3d 700, 715 n.11 (3d Cir. 2004).

F.3d 198, 221 (3d Cir. 2000).  Indeed, publication in the mid-1990s could certainly be overcome

by the passage of time, wherein significant evidence suggests that the term "Globalaw" always

was or subsequently has become generic.  *See Retail Servs. Inc. v. Freebies Pub'g*, 364 F.3d 535,

545-46 (4th Cir. 2004) (finding plaintiff's registered mark to have become generic due in part to

widespread use by third parties); *cf.* 15 U.S.C. § 1064 (providing that a mark may be cancelled if

it becomes the common descriptive name of the time, i.e., becomes generic).

Second, C&C contends that Counterclaim Defendants, in both their pleadings and their

depositions, have entered a judicial admission that "GLOBALAW" is not a generic term.  *See*

C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 22-23.  C&C notes that:  (1)

GLOBALAW Limited, in its original Complaint against C&C, argued that it was "the owner of

United States trademark rights in the GLOBALAW service mark in connection with association

services, namely promoting the interests of a group of law firms providing legal services on an

international basis," Compl. ¶ 19, thereby implicitly "admitting" that the term was not generic;

(2) Campbell, by attempting to register the mark with the USPTO and in making certain

arguments before the TTAB, essentially admitted that the term was not generic; and (3)

statements made by GLOBALAW Limited's Rule 30(b)(6) corporate designee in this litigation,

C. Baird Brown, support the conclusion that the mark is not generic, as Brown asserted that

GLOBALAW Limited owned all rights to the mark.  *Id.* (citing CBB at 48-49).  Each of these

contentions is without foundation.  Importantly, any representation made by GLOBALAW

Limited, Campbell, or Brown concerning rights to the term are legal conclusions.  Legal

conclusions simply cannot constitute admissions; that is, parties cannot bargain away legal

conclusions, and it is for the Court – not the parties – to determine whether a term is protectable,

generic, or whether a material issue of disputed fact remains.  *See Dabertin v. HCR Manor Care, Inc.*, 68 F. Supp. 2d 998, 1000 (N.D. Ill. 1999) (stating that "[i]t is well settled that judicial admissions on questions of law have no legal effect"); *Borecki v. E. Int'l Mgmt. Corp.*, 694 F. Supp. 47, 56 (D.N.J. 1988) (noting that "while the averment may contain certain assumptions as to the underlying facts, it is more in the nature of a legal conclusion, and does not, therefore, constitute an admission").  Rather, as the counterclaim proponent, it is C&C's burden to affirmatively establish that the term is not generic.  *See Blinded Veterans Ass'n*, 872 F.2d at 1041.

Third, C&C attempts to attack Counterclaim Defendants' evidence of the generic nature of the term in two ways:  (1) it points out that the majority of the examples of third-party use supplied by Counterclaim Defendants' expert Kera involve the use of the terms "Global Law," as opposed to the single "Globalaw," *see* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 21-22; and (2) it argues that the Recognition Survey conducted by Counterclaim Defendants' expert Joseph Ridgway is "fatally defective" because he surveyed "the wrong universe" – i.e., he wrongly surveyed "international lawyers" rather than the "purchasing public," "an irrelevant group with far different sophistication, training, and interests than clients looking for legal counsel, which would be part of the purchasing public," *id.* at 26.  Upon a studied consideration, it is clear that each of these arguments is without merit.

While most of the examples of third-party use supplied by Counterclaim Defendants involve the use of the terms "Global Law," as opposed to the single "Globalaw," this fact does not change the beneficiary nature of their application to a finding of genericness and/or descriptiveness.  It has routinely been found that the "telescoping" of words will not produce or

transform two generic or descriptive terms into a protectable mark.  *See, e.g.*, *In re SPX Corp.*, 63

U.S.P.Q.2d 1592, 1596 (T.T.A.B. 2002) (stating that "[i]t has been held in numerous cases that

telescoping two words which are merely descriptive of the goods into a single term by the

deletion of a space does not avoid a finding of mere descriptiveness for the combined term");

*Micro Motion Inc. v. Danfoss A/S*, 49 U.S.P.Q.2d 1628, 1631-32 (T.T.A.B. 1998) (finding that

"because the term MASSLO directly names the most important or central aspect or purpose of

applicant's goods, that is that the meters are mass flowmeters (meters that measure mass flow),

this term is generic . . . . Further, the fact that MASSFLO is a telescoped, slightly misspelled

version of 'mass flow' does not compel a different result.").  Accordingly, Counterclaim

Defendants' decision to highlight the third-party uses of "Global Law," along with "Globalaw,"

is both proper and relevant.

        Moreover, Ridgway's decision to survey lawyers in six markets who practice

international law, rather than C&C's conception of the "purchasing public," was reasonable.  In

the typical situation, surveys are conducted of the "purchasing public" because, "to be probative

and meaningful . . . surveys . . . must rely upon responses by potential customers of the products

in question. . . . Respondents who are not potential customers may well be less likely to be aware

of and to make relevant distinctions when reading ads than those who are potential customers."

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990) (internal

quotations and citations omitted).  Upon an examination, it is clear that Ridgway's universe was

correct, even if slanted to search out those who might have heard of C&C and its

"GLOBALAW" imprimatur.  Clients and lawyers often rely on referrals from other lawyers when

selecting firms that will be employed to provide legal services.  As such, the lawyer who is aware

of international legal issues is one who is more likely to be consulted for a referral on the subject

and will be the one who influences the purchase of legal services, which is the very point of

Counterclaim Defendants' "GLOBALAW Limited" network.  *Cf.* 11/28/05 Haggai Carmon Aff.

¶ 6 (alleging that the majority of C&C's practice involves international legal/consulting matters).

Additionally, the legal community tends to be relatively close, and practitioners are often more

aware of those practicing within their respective jurisdictions than the public-at-large – a fact

which should be heightened in this case, given C&C's relatively minimal amount of advertising.

*See* Countercl. Defs.' Reply at 10 (citing C&C's Resp. to Countercl. Defs.' Interrogs.) (C&C

admits that it has spent only approximately $15,000.00 nationwide on advertising annually).

Accordingly, because (1) an attorney would likely be involved in the selection of counsel to

handle a particular manner and (2) an attorney practicing international law like C&C would

likely be more cognizant of C&C and "GLOBALAW" than a member of the general public,

Ridgway's selection of a survey group was appropriate.  Indeed, for C&C to argue that the

Recognition Survey utilized the wrong universe, when it focused both on individuals *more likely*

to have knowledge of C&C/GLOBALAW Inc. and cities where C&C actually has an alleged

presence, is disingenuous at best.[13]

Fourth, C&C attempts to provide some affirmative evidence of its own – rather than

simply attacking Counterclaim Defendants' evidence – through the declarations of three (3) of its

clients.  Specifically, it offers the declarations of its customers Eugene Lemay, Levy Cohen, and

---

[13] Ridgway's survey focused on attorneys in (1) Houston, (2) Los Angeles, (3) New York,
(4) Philadelphia, (5) Seattle, and (6) Washington, D.C.  *See* Recognition Survey at 2.  Five of the
cities included are where parties in this litigation maintain offices.  New York was chosen in part
because it is where C&C is located, and New York and Los Angeles were also focused on
because C&C has alleged that it provided advertisements in those areas.  *See generally id.*

Yehuda Pearl.  *See* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., Ex. 13.  Two major

problems exist with this "evidence" in the context of a summary judgment motion:  (1) this is the

first time C&C has identified these individuals and/or their companies, having failed to include

them on its Rule 26(a)(1) Initial Disclosures, or subsequent amended disclosures, and having

failed to identify them in response to Counterclaim Defendants' Interrogatories; and, more

importantly, (2) the statements by these three individuals are plainly insufficient to apprise the

Court of the perception of the "consuming public."  Indeed, nothing in these bare-bones

declarations shows that the declarants have *any* basis to suggest that the term "GLOBALAW" is

descriptive or suggestive; in fact, these individuals merely state that they recognize the term

"GLOBALAW" as the one C&C uses, so they know C&C uses it.

　　　Fifth, and finally, C&C has visited the USPTO's website and provided the Court with

examples of telescoped marks involving "global" that have been accepted by its "expert

examiners" as registerable and not descriptive or generic.  *See id.*, Ex. 12 (Results for Trademark

Electronic Search System).  These "accepted" marks include terms such as "GLOBALGRIP,"

"GLOBALMOGUL," "GLOBALIFELINE," "GLOBALENGLISH," "GLOBALGIVING," and

"GLOBALVEST."  *Id.*; *see also* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 19-20.

　　　There are three distinct problems with this final argument put forth by C&C.  First, as

noted previously, determinations by trademark examiners are not binding upon federal courts.

*See A & H Sportswear, Inc.*, 237 F.3d at 221; *see also Marketing Displays, Inc. v. Traffix

Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999); *Carter-Wallace, Inc. v. Procter & Gamble Co.*,

434 F.2d 794, 802 (9th Cir. 1970).  Second, C&C's examples are particularly inapposite given

that the differing (i.e., lighter) burden of proof before the USPTO.  When a term is not a

registered trademark, the burden is on the proponent in federal court to prove that the term is *not*

generic.  *See Blinded Veterans Ass'n*, 872 F.2d at 1041; *Reese Publ'g Co.*, 620 F.2d at 11;

*McCarthy on Trademarks & Unfair Competition* § 12:2.  In contrast, the USPTO – when

refusing to register a proposed mark for genericness concerns – "has the burden of proving this

refusal with 'clear evidence' of genericness."  *In re Cent. Sprinkler Co.*, 49 U.S.P.Q.2d 1194,

1196 (T.T.A.B. 1998) (citing *In re Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567,

1571 (Fed. Cir. 1987)).  As such, because it is *much* easier for a proponent to show that a mark is

non-generic before the TTAB than to establish that the mark is non-generic in federal court,

examples of registered terms are of little evidentiary value in federal litigation.  Third, and most

importantly, the examples cited by C&C do not address the term at issue here – i.e.,

"GLOBALAW" or "Global Law."  Rather, each of the marks is apparently for unrelated services,

without any evidence of any use that would impact on the perceptions of the relevant public

and/or practitioners.[14]  As such, the examples have little relevance to C&C's claims; for example,

"GLOBALVEST," a trademark for an international investment advisory service, might well be

protectable, as "globalvest" or "global vest" is not a generic phrase or synonym for "international

investing assistance."  Such a fact does not alter the apparent truism that "Globalaw" is a generic

phrase or synonym reflecting the practice of international law by a law firm or practitioner.

---

[14] The Court agrees with C&C that the fact that the mark in question utilizes the word "Global" does not make it inherently generic.  *See* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., at 20-21 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 432, 486-87 (5th Cir. 1971) (holding that the marks including the terms "Globe" and "World" should not automatically be rejected under a theory that those words are geographic or identify a place of origin)).  However, marks including the phrase "Global" might still be generic.  "GLOBALAW" – for the five above-described reasons – is generic, not because it includes a term reflecting the place of origin, but because it is a generic phrase or synonym reflecting the practice of international law by a law firm or practitioner with no other public meaning.

### iii.    Conclusion With Respect to the Generic Nature of "GLOBALAW"

Ultimately, to succeed in its Count II and IV trademark infringement claims,

Counterclaim Plaintiff C&C must affirmatively produce evidence that the mark at issue –

"GLOBALAW" – is not generic.  Upon a review of the argument and "evidence" presented in its

Opposition to Counterclaim Defendants' Motion for Summary Judgment, it is clear that C&C has

failed to meet its burden.  Rather, C&C has failed to refute Counterclaim Defendants' evidence

set out in the form of "GOOGLE" search data and the expert reports of David Kera and Joseph

Ridgway; moreover, its own "affirmative" evidence – i.e., the declarations of three of its own

customers and selected trademarks listed with the USPTO – is inapposite, irrelevant, and

inconclusive.

A review of the evidence in the record before the Court indicates that the term

"Globalaw" falls into the generic category because it answers the question, "What are you?"  *See*

*Golf Warehouse, LLC*, 142 F. Supp. 2d at 1311-12 (finding that the mark "Golf Warehouse" was

a generic denotation of a particular type of retail store, based upon the court's review of the

widespread retail usage and the secondary dictionary definition, and despite the issuance of a

federal service mark registration to the non-movant); *see also Mil-Mar Shoe Co. v. Shonac*

*Corp.*, 75 F.3d 1153, 1158 (7th Cir. 1996) (noting that, although not controlling, use consistent

with the dictionary definition connotes genericness).  Here, the dictionary definitions of the

component parts of the trade name imply use consistent with common understanding.[15]  *See id.* at

---

[15] "Global" is defined by *The American Heritage College Dictionary* 580 (3d ed .1997) as "of, relating to, the entire earth; worldwide," and by *WordNet ® 2.0* as "involving the entire earth; not limited or provincial in scope, i.e., 'global war,' 'global monetary policy.'" "Law" is defined by *The American Heritage College Dictionary* 769 (3d ed .1997) as "[t]he science and

1311 ("Because generic use implies use consistent with common understanding, courts often look to dictionaries as a source of evidence on genericness.").  Moreover, all competent evidence suggests that the primary significance of the term "Globalaw" in the minds of the public and relevant practitioners (if such a significance exists at all) is the product, i.e., international legal practice, *not* the producer, i.e., C&C or Counterclaim Defendants.  That is, buyers understand the phrase "Globalaw" to refer to the practice of and expertise in international/transnational law, and not a reference to C&C itself or some network of firms that it might have claimed.  Because of this common understanding and the overall generic nature of the phrase "globalaw" or "global law," numerous law firms, law schools, and publications have employed the term or its component parts in advertising and promoting their own interests, which are quite separate from the interests at play in this dispute.  *See* Chotvacs Decl. ¶ 2, Exs. A-T (noting, in part, that Thomson – a third-party – publishes *Globalaw Quarterly*, a publication using the service mark at issue here); *see also Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 364 (S.D.N.Y. 2003) (noting that numerous examples of third-party use of design supported a finding that the design was generic).  Given C&C's failings, the relevant burdens, and the plethora of evidence suggesting that "GLOBALAW" is too generic to merit protection, the Court concludes that the mark at issue in this case is generic.  Because it is generic, C&C's Count II and IV trademark infringements claims must fail, as the mark itself is not protectable.

This conclusion, that "GLOBALAW" must fall into the generic category, is consistent with previous cases finding similar terms to be without protection.  *See, e.g.*, *Blinded Veterans Ass'n*, 872 F.2d at 1041-42 (concluding that "blinded veterans" is a generic, unprotectable phrase

---

study of law; jurisprudence.  Knowledge of law.  The profession of an attorney."

"by which the public refers to former members of the armed forces who have lost their vision");

*Donchez*, 392 F.3d at 1217-18 (finding the term "Beerman" to be generic and unprotectable);

*Mil-Mar Shoe Co.*, 75 F.3d at 1159 (holding "Warehouse Shoes" to be generic); *Nat'l Conf. of*

*Bar Exam'rs v. Multistate Legal Studies*, 692 F.2d 478, 488 (7th Cir. 1982), *cert. denied*, 464

U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) (concluding that "Multistate Bar Examination"

could not be protected because it is a generic term denoting the bar examination suitable for use

in more than one state); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir.

1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978) ("Light Beer" or "Lite

Beer" denotes low-calorie beer, and cannot be protected); *Abercrombie & Fitch Co. v. Hunting*

*World, Inc.*, 537 F.2d 4, 11-12 (2d Cir. 1976) ("safari" in conjunction with an item of clothing,

e.g., "safari hat," is a generic term denoting a particular type of khaki-colored apparel); *Dresser*

*Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 462-63 (3d Cir. 1968), *cert.*

*denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968) (the term "Roots" was generic,

denoting rotary positive displacement lobe-type vacuum pumps); *see also McCarthy on*

*Trademarks & Unfair Competition* § 12:3 (providing examples of generic terms).  Accordingly,

given the parameters and persuasiveness of these precedents, as well as C&C's failure to meet its

burden and Counterclaim Defendants' substantial evidence as to the "generic" nature of

"GLOBALAW," the Court shall grant summary judgment to Counterclaim Defendants with

respect to C&C's trademark infringement claims contained within Counts II and IV of its

Counterclaim.

2.      Even Assuming *Arguendo* that "GLOBALAW" Is a Protectable Mark
        Owned By C&C, Can C&C Establish that "GLOBALAW" Has Achieved
        Secondary Meaning?

a.      *Basic Standards*

Assuming – for the sake of argument – that the mark "GLOBALAW" was not generic,

but instead fell into one of the "protectable" categories, it is clear that the term is "descriptive" at

best.[16]  "Descriptive terms 'impart information directly,'" *Packman*, 267 F.3d at 641 (quoting

*M.B.H. Enter., Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980)); that is, descriptive terms

"directly describe a particular quality, function, or characteristic of a product or service," *Blinded

Veterans Ass'n*, 872 F.2d at 1039-40.  Had the "primary significance" of the term

"GLOBALAW" been non-generic, the mark could then be described as indicative of a "function"

or "service" offered by C&C – i.e., that it specializes in international law and global issues.

Accordingly, like somewhat similar terms, "GLOBALAW" would fall into the "descriptive"

category for purposes of trademark protection under the Lanham Act and common law.  *See, e.g.*,

*Packman*, 267 F.3d at 641 (the phrase "the joy of six" was descriptive at best); *The Sports

Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 961 (2d Cir. 1996) ("The Sports

Authority" was descriptive of a sporting goods store); *Remington Prods., Inc. v. N. Am. Phillips

Corp.*, 892 F.2d 1576, 1580-82 (Fed. Cir. 1990) ("Travel Care" was descriptive of pressing

irons); *Info. Superhighway, Inc.*, 395 F. Supp. 2d at 51-52 ("Telsave" or "Telsave.com" was

descriptive of a telecommunications service); *Ideal World Marketing, Inc. v. Duracell, Inc.*, 15 F.

---

[16] This, of course, is also assuming that C&C could actually hold a protectable service
mark in "GLOBALAW" despite the fact that when C&C holds itself out interchangeably as
"GLOBALAW," *see*  C&C's Reply to Countercl. Defs.' Opp'n to C&C's Mot. to Reconsider at
4-5, it may well be practicing under a trade name in violation of New York State law.  *See* 22
NYCRR § 1200.7[B].

Supp. 2d 239, 244 (E.D.N.Y. 1998) ("Powercheck" was a descriptive term for a product which

checks the power on a battery); *Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 225

(S.D.N.Y. 1996) ("Snakelight" was descriptive of a flashlight with a flexible neck); *Bernard v.*

*Commerce Drug Co.*, 774 F. Supp. 103, 107-08 (E.D.N.Y. 1991) ("Arthricare" was a descriptive

term, denoting the general use – i.e., treatment for arthritis – to which the product or service is

put); *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 216-17 (2d Cir. 1985) ("Sportscreme"

was descriptive of a topical heat analgesic); *Karmikel Corp. v. May Dep't Stores Co.*, 658 F.

Supp. 1361, 1370 (S.D.N.Y. 1987) ("Fast Track" was descriptive of athletic wear); *Scholastic,*

*Inc. v. Macmillan, Inc.*, 650 F. Supp. 866, 871 (S.D.N.Y. 1987) ("Classroom," a magazine

directed at teachers and students, was descriptive); *Metromedia, Inc. v. Am. Broad. Co.*, 210

U.S.P.Q. 21, 23-24 (S.D.N.Y. 1980) ("Rocktober" was descriptive of a rock music broadcast

held in the month of October); *see also McCarthy on Trademarks & Unfair Competition* § 11:8

(providing examples of descriptive terms).

 "Because descriptive terms are thus not inherently distinctive, they acquire trademark

protection only upon proof of secondary meaning – *i.e.*, upon proof that the public recognizes

only one source of the product or service." *Blinded Veterans Ass'n*, 872 F.2d at 1040 (citing

*Kellog Co.*, 305 U.S. at 118, 59 S.Ct. 109) (stating that a term has acquired secondary meaning

when "the primary significance of the term in the minds of the consuming public is not the

product but the producer"); *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1045 (8th Cir.

1996) ("A descriptive trademark is the weakest protectable mark and requires proof that the mark

has acquired secondary meaning."); *see also McCarthy on Trademarks & Unfair Competition* §

15:2 (defining secondary meaning)); *Packman*, 267 F.3d at 641 ("Secondary meaning is 'a

64

*mental association* in buyers' minds between the alleged mark and a single source of the

product.'") (quoting *McCarthy on Trademarks & Unfair Competition* § 15:5).  In other words,

"[a] mark acquires secondary meaning when it has been used so long and so exclusively by one

company in association with its goods or services that the word or phrase has come to mean that

those goods or services are the company's trademark."  *Packman*, 267 F.3d at 641 (citing

*McCarthy on Trademarks & Unfair Competition* § 15:5), *Platinum Home Mortgage Co. v.*

*Platinum Fin. Group, Inc.*, 149 F.3d 722, 728 (7th Cir. 1998)).  The scope of a plaintiff's rights

to a descriptive term is limited to those areas where secondary meaning exists before the alleged

infringement by the defendant begins.  *See Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins.*

*Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) ("A plaintiff must establish secondary meaning in

a mark at the time and place that the defendant began use of the mark."); *Minn. Mining & Mfg.*

*Co. v. Beautone Specialities Co.*, 82 F. Supp. 2d 997, 1003 (D. Minn. 2000) (noting that the

plaintiff must prove that the mark acquired secondary meaning prior to the date of first use by the

defendant); Restatement (Third) of Unfair Competition § 19 cmt. b, reporter's note (1995).

    The burden of proving that a term has acquired secondary meaning rests squarely with the

plaintiff, and has been described as a "substantial," *Zatarains*, 698 F.2d at 794, or "vigorous

evidentiary burden," *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 652 F. Supp. 1105, 1108

(S.D.N.Y. 1987) (recognizing that the "[p]laintiff bears the vigorous evidentiary burden of

proving by a preponderance of the evidence that his mark had acquired secondary meaning at the

time defendant began his allegedly infringing activities").  In this case, the relevant buying public

are individuals, practitioners, and corporations in the market for/interested in legal services on a

nationwide basis, where C&C claims rights.  *See* C&C's Counterclaim ¶¶ 37-38, 40; 11/28/05

Haggai Carmon Aff. ¶ 9 ("Carmon & Carmon used and promoted its mark continuously since

1987 and continues to do so nationally."); *see also Am. Ass'n for the Advancement of Sci.*, 498 F.

Supp. at 256 (the relevant inquiry is not whether the general public associates a name with a

product or source, but whether the "relevant buyer class" does).   Moreover, C&C must show that

secondary meaning was achieved by the time Counterclaim Defendants first began using the term

"GLOBALAW" in each geographic locale in which C&C is claiming infringement – which, in

this case, is nationwide.   *Id.*

> Courts within this jurisdiction have repeatedly held that
>
> [t]he existence of secondary meaning under Section 43(a) is a factual
> determination and, while there is no definitive list of criteria used to determine
> secondary meaning, courts do look to "(1) the duration and continuity of use of
> the mark, (2) the extent of advertising and promotion and amount of money spent
> thereon, (3) figures showing sales of plaintiff's products or number of people who
> have viewed it, and (4) identification of plaintiff's and defendant's respective
> markets.

*PRD*, 312 F. Supp. 2d at 12-13 (quoting *Am. Ass'n for the Advancement of Sci.*, 498 F. Supp. at

257; citing *Russian Acad. of Sci. v. Am. Geophysical Union*, Civ. A. No. 98-2165, 1998 U.S.

Dist. LEXIS 20598, at *12 (D.D.C. Dec. 16, 1998)).   In addition to the kind of circumstantial

evidence that may be relevant to a determination of "secondary meaning," a plaintiff may also

establish secondary meaning through the use of direct evidence, such as consumer surveys or

testimony from consumers.   *See Donchez*, 392 F.3d at 1218.   "Courts have consistently found

that an expert survey of purchasers can provide the most persuasive evidence of secondary

meaning."   *Seed Lighting Design Co. v. Home Depot*, No. C 04-2291, 2005 WL 1868152, at *5

(N.D. Cal. Aug. 3, 2005); *accord Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 39

(1st Cir. 2001) (holding that surveys are the "preferred" method of demonstrating secondary

meaning); *Zatarains*, 698 F.2d at 795 (stating that "survey evidence is the most direct and persuasive way of establishing secondary meaning"); *McCarthy on Trademarks & Unfair Competition* § 32:190 (when a plaintiff has less than a clear case, a survey may be necessary).

> b.    *Application*

Upon a review of the evidence and arguments presented, it is clear that C&C's "attempt" to establish secondary meaning in its alleged "GLOBALAW" mark is fatally deficient in five respects.  In short, C&C (1) has produced no competent direct evidence in support of its secondary meaning claims, and, with respect to circumstantial evidence, (2) C&C's use of the mark has been sporadic and fortuitous, (3) C&C's advertising in the relevant markets was *de minimis* at best, (4) C&C's use is completely undercut by the innundation of use by third-parties, and (5) there is simply no substantial overlap in the markets in which C&C and Counterclaim Defendants operate.

> i.    <u>No Competent Direct Evidence of Secondary Meaning</u>

First, C&C has produced no competent direct evidence of secondary meaning. Importantly, C&C failed to conduct a consumer survey demonstrating that the purchasing public associates the term "GLOBALAW" solely or predominantly with C&C.  On the other hand, Counterclaim Defendants, through their expert Joseph Ridgway and his Recognition Survey, have demonstrated that no secondary meaning has attached to the term "GLOBALAW" by C&C's use thereof.  Of the sixty-six (66) lawyers practicing international law that were surveyed, "[m]ost (92%) said they have never seen or heard the word, term or phrase GLOBALAW used in any way," and "[a]mong the small portion of lawyers (8%) who said they had seen or heard GLOBALAW used, there was no consensus regarding the source."  Recognition Survey at 6.

Based on the results of the survey, Ridgway concluded:

> A.     There is virtually no awareness of the word, term or phrase GLOBALAW being used in any way.  Of the small proportion of lawyers who thought they had seen it used, each gave a different response regarding how they had seen it used.  Only one lawyer could provide an answer to the question of whom had used GLOBALAW and in that one case, several possibilities were put forth.
>
> B.     There is no association of the word, term or phrase GLOBALAW with Carmon & Carmon.

*Id.* at 7.  Accordingly, the Recognition Survey clearly demonstrates that "GLOBALAW" has not attained secondary meaning, as not a single lawyer associated the term "GLOBALAW" with C&C.  While C&C's failure to rebut this survey and/or conduct its own survey is not – by itself – determinative, it is a significant failure.  As Judge Charles R. Richey noted in *U.S. Express, Inc. v. U.S. Express, Inc.*, 799 F. Supp. 1241 (D.D.C. 1992),

> Although the Plaintiff cannot be penalized for failing to produce a survey of consumer opinion as of 1984, the failure to produce any evidence of consumer association of the term "U.S. Express" with Plaintiff's services, even in the form of *current* survey evidence, testimonials from customers and the like, fatally undermines Plaintiff's claim.

*Id.* at 1245-46; *see also Info. Superhighway, Inc.*, 395 F. Supp. 2d at 52 (finding no secondary meaning because, in part, plaintiff failed to submit any consumer studies or expert witnesses linking the name to a single source, sales related to the use of the name, or a lengthy and exclusive use of the name).

The sole direct evidence that C&C presents is in the form of declarations submitted by three (3) of its present or former clients – Eugene Lemay, Levy Cohen, and Yehuda Pearl.  *See* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J., Ex. 13.  Multiple problems undermine whatever relevance this "evidence" could have.  First, it is C&C's burden to show that its

68

"GLOBALAW" mark had achieved secondary meaning by the time that Counterclaim

Defendants allegedly began infringing on that mark, in either 1993 or 1994. However, Cohen

states that "*[s]ince 1998* . . . [I have] retained and recognized Globalaw as the law firm Carmon

& Carmon," Cohen Decl. at 1, and Pearl provides that "I have been using the professional legal

services of Rakeffet Carmon, Esq. and of Haggai Carmon, Esq. of the law firm of Carmon &

Carmon-GLOBALAW *since the late 90's*," Pearl Decl. ¶ 3 (emphasis added).[17]  As such, only

the Lemay Declaration is at all relevant to the issue of secondary meaning.  Second, one (1) – or

even three (3) – customers stating that they equate "GLOBALAW" to C&C does not come close

to establishing secondary meaning in a single geographic area, let alone for the entire United

States.  *See Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979) (while seven (7) of

plaintiff's customers testified that the name "vision center" meant plaintiff's business to them,

the court found that the "evidence falls short of establishing in the minds of the consuming public

the Primary significance of the term 'vision center' is 'not the product but the producer'");

*Grupke v. Linda Lori Sportswear, Inc.*, 921 F. Supp. 987, 996 (E.D.N.Y. 1996) (plaintiffs

produced letters from four (4) customers who alleged to associate the mark with plaintiffs, but

court granted summary judgment to defendant, finding that plaintiff's evidence failed to meet the

"rigorous evidentiary requirements" for secondary meaning); *cf. Spraying Sys. Co. v. Delavan,

Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (even surveys that do show consumers associating the

plaintiff's designation with a single source must do so on more than a *de minimis* scale; "[w]hile

a 50-percent figure is regarded as clearly sufficient to establish secondary meaning, a figure in

---

[17] As discussed previously in the context of the Lemay Declaration, the Cohen and Pearl Declarations are improper, as they are not dated, in violation of 28 U.S.C. § 1746, and do not state that the statements therein are "true and correct," as instructed by 28 U.S.C. § 1746 as well.

the thirties can only be considered marginal").

ii.     C&C's Use of the Mark Has Been Sporadic and Fortuitous

Second, moving to a consideration of circumstantial evidence, it is clear that C&C's

alleged use of the "GLOBALAW" designation has been haphazard, sporadic, and fortuitous,

rather than continuous over a significant period of time.[18]   A common law service mark arises

from the adoption and actual use of a term to identify services with a particular party.  *See Tally-*

*Ho Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1990); *Mars Musical*

*Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1148 (D. Minn. 2001).  Actual and

continuous use is required to attain and retain a protectable interest in a mark; that is, the use

must be more than "small, sporadic or inconsequential."  *Mars Musical Adventures*, 159 F. Supp.

2d at 1148; *see also Tally-Ho*, 889 F.2d at 1022; *McDonald's Corp. v. Burger King Corp.*, 107 F.

Supp. 2d 787, 790 (E.D. Mich. 2000) (stating that "a party establishes a common law right to a

trademark only by demonstrating that its use of the mark was deliberate and continuous, not

sporadic, casual or transitory").

As discussed previously, the "GLOBALAW" service mark has been publicly employed –

whether lawfully or unlawfully – by C&C in at least three ways.  First, on some occasions C&C

has utilized the term to denote "GLOBALAW" as some kind of "division" of C&C.  *See*

Countercl. Defs.' Mot. for Summ. J., Ex. 14 (2003 letter from C&C).  Second, on other

occasions, C&C has employed the mark on its letterhead to denote that C&C are "Administrators

of GLOBALAW – A Worldwide Network of Independent Law Firms."  *See* Countercl. Defs.'

---

[18] The Court's analysis in this subsection combines secondary meaning analysis with a gloss on C&C's Count IV common law trademark infringement claim, as the two are closely related.

Mot. for Summ. J., Ex. 13 (4/11/00 C&C Letter).  Third, C&C – at times – has used the term

"GLOBALAW" as a synonym or trade name for itself.  *See also* Chotvacs Decl. ¶ 3 & Ex. U

(screen shot of www.globalaw.com).  ("GLOBALAW is an international law firm assisting its

clients in their foreign legal matters through its network of members in 85 countries.  Break the

time, language and cultural barriers.  Call GLOBALAW with your foreign legal questions.").

 In addition to its ever-changing usage, C&C's own conception of "What is

GLOBALAW?" appears to be inconsistent and ever-changing.  For instance, in its Answer and

Counterclaim, C&C explained that it used the "GLOBALAW" mark

> as a means of connecting many firms around the world, including the United
> States, in a network of law firms in order to refer work to each other and receive
> referrals from each other.  They used and are continuously using the Mark as an
> indication of their own worldwide contacts with law firms in the United States
> and in many countries.  In both of these ways and in others, they used and
> continuously use the Service Mark, inter alia, to designate the source of their law
> and business practice.

C&C's Counterclaim ¶ 38.  C&C further claimed in its Counterclaim that it "sent membership

packages to many law firms in the 1980s and 1990s soliciting or facilitating their membership in

their alliance of law firms called 'Globalaw.'" *Id.* ¶ 40.  However, in its Opposition to

Counterclaim Defendants' Motion for Summary Judgment, C&C completely reversed its position

as to what its "GLOBALAW" constitutes, arguing:

> Carmon is not here claiming a network of lawyers.  It is asserting that the
> GLOBALAW service mark identifies the source of the firm's legal services.
> Haggai Carmon repeatedly affirmed and reaffirmed in his depositions that
> GLOBALAW is the same as Carmon and Carmon – it is the name the firm uses to
> identify itself in the practice of law and its services.  (Exh. 11).  Counterclaim
> Defendants['] attempt to erect a straw horse network issue so they can knock it
> down in their memorandum.  Carmon does not lay claim to infringement or
> monetary award relating to a network owned, operated by, or conducted by
> Carmon & Carmon.  Whether there was or is a group of law firms Carmon has

> worked with in the past or works with now in the form of a network, is irrelevant
> to the infringement and monetary award sought in this case.

C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 9-10; *see also id.* at 12 n.4 ("Globalaw,

Inc. was merely a service company and ceased to operate several years ago.  It never had a

network.").  Moreover, it is entirely unclear as to whether C&C continues to actually use the

"GLOBALAW" or "GLOBALAW, Inc." imprimatur, as Haggai Carmon testified in his

deposition that – whatever C&C's "GLOBALAW" actually is – it has not done business since

2001.  *See* HC at 45-46 ("[W]e did not fold it, the company is still legally registered.  It is not

active.  It has not done business since, I believe, 2001.  There is no income, no expenses.").

Assuming that "C&C "did and still does practice law . . . under the service mark . . .

GLOBALAW (without 'P.C.' or Inc.')," C&C's Reply to Countercl. Defs.' Opp'n to C&C's

Mot. to Reconsider at 4, C&C's usage of the mark post-2001 has clearly been inconsistent with

and different than its pre-2001 usage – a key failing under the relevant test.

Given this evidence and testimony, it is clear that the alleged use of the "GLOBALAW"

designation by C&C is a haphazard, sporadic afterthought that has been employed in a confusing,

inconsistent, and seemingly unlawful manner.  Accordingly, this circumstantial evidence cuts

against – rather than for – C&C's assertions that it has some common law trademark rights in the

name, or its use has created "secondary meaning."

### iii.    C&C's "Nationwide" Advertising Was *De Minimis*

Third, C&C has not provided any specific evidence regarding the extent of its advertising

of the term "GLOBALAW" and the amount of money it has spent thereon since it allegedly

began using the term.  *See Duggal*, 554 F. Supp. at 1047 (noting that in the secondary meaning

determination, the extent of advertising and promotion of the mark was a consideration); *see also*

*U.S. Express, Inc.*, 799 F. Supp. at 1245 (same).  Again, C&C makes a general claim that "[w]e

have promoted the mark GLOBALAW extensively for at least [the] past 18 years, using word of

mouth, print advertising, brochures, a web site, and other means."  11/28/05 Haggai Carmon Aff.

¶ 2.  However, C&C fails to provide any facts stating (1) where this alleged advertising took

place; (2) when each form of advertising began, ended, or its duration; (3) what the content was

of the advertising; and (4) exactly how much money C&C spent on advertising.  Indeed, even

considering C&C's extra-record response to Counterclaim Defendants' Interrogatories, wherein

C&C claimed – with no proof – that it spent approximately $15,000.00 nationwide on advertising

annually, it is clear that any advertising by C&C with respect to the "GLOBALAW" mark has

been so *de minimis* and minuscule that no inference of nationwide secondary meaning could

possible be drawn.  Moreover, C&C's lack of evidence highlights the fact that it cannot show the

necessary effect that this minimal advertising had on the consumer, whether within New York or

nationwide.  *See Co-Rect Prods., Inc. v. Marvy Adver. Photography, Inc.*, 780 F.2d 1324, 1331

(8th Cir. 1985) (stating that "it is the *effect* of such advertising that is important, not its extent")

(emphasis in original) (citation omitted).

    Indeed, C&C has failed to provide any figures showing the sales of its services or the

number of people who have viewed its "GLOBALAW" mark.  For example, while Haggai

Carmon, in his declaration, remembers for the first time a list of thirty (30) matters or types of

matters in which he has been involved (despite being unable to recall such information in his

deposition), *see* 11/28/05 Haggai Carmon Aff. ¶ 6, he places no dollar amount on the amount of

business these matters have brought in for C&C, nor does he indicate whether that business has

been obtained pursuant to the "GLOBALAW" mark.  Further, many of the matters listed by

Haggai Carmon involve foreign matters and foreign clients, aspects which are outside the realm

of anything relevant to this case and the rights claimed by C&C.  As such, this circumstantial

evidence once again undercuts C&C's secondary meaning argument.  *See U.S. Express, Inc.*, 799

F. Supp. at 1246.

iv. <u>Extensive Third-Party Use Undercuts C&C's Position</u>

  Fourth, the extensive third-party use of the term "Globalaw" or "Global Law" severely

diminishes C&C's claim vis-á-vis secondary meaning.  "Proof that others are using a term

descriptively on the same or closely related goods[] is evidence tending to rebut alleged

secondary meaning in a descriptive term."  *McCarthy on Trademarks & Unfair Competition* §

11:25; *see also U.S. Express, Inc.*, 799 F. Supp. at 1246 ("Such overlapping uses of the

tradename weaken Plaintiff's claim that consumers of air freight forwarding and freight delivery

services are likely to associate the term 'U.S. Express' exclusively with its services.") (citations

omitted).  As discussed previously, *supra* Section III(B)(1)(b)(i), instances of third-party use

abound, as evidenced through the results of Internet searches appended to the Chotvacs

Declaration, which showed extensive use of the term by law firms, law schools, and otherwise,

*see* Chotvacs Decl. ¶ 2, Exs. A-T, as well as the searches undertaken by Counterclaim

Defendants' expert David Kera and referenced in his expert report, *see* Kera Report at 6, 10-13.

Such overlapping use of the words "Global Law" or "Globalaw" eviscerates C&C's assertion

that consumers of legal services recognize C&C as the sole source of the "GLOBALAW"

imprimatur.

74

v.    No Significant Overlap in Respective Markets

Fifth, and finally, C&C's quest to establish secondary meaning also fails due to its

inability to show any true overlap between its market(s) and Counterclaim Defendants'

respective markets.  C&C has provided negligible documentation showing the extent of its

business in the jurisdictions served by Counterclaim Defendants either before the Counterclaim

Defendants first made any use of the term "GLOBALAW" to identify their membership in the

network, or after Counterclaim Defendants began their usage in 1993-94.  Moreover, other than

the approximately thirty (30) matters/types of matters belatedly identified by Mr. Carmon, which

mainly involve foreign matters/clients and matters in the State of New York, and the three

suspect declarations, which involve companies in New York, New Jersey, and California, C&C

does not state what States it practices in, other than "almost every state in the union," 11/28/05

Haggai Carmon Aff. ¶ 7.  *See also id.* ¶ 9 ("Carmon & Carmon has rendered and does render

legal services throughout the United States.").[19]  A review of Mr. Carmon's "overlap chart" –

based upon assertions supported by no evidence in the current summary judgment record –

reinforces the fact that C&C's practice does not significantly overlap with the practice of

Counterclaim Defendants.  *See* Attach. to 11/28/05 Haggai Carmon. Aff.; *supra* Section I(A)(5).

Of the fifty-two (52) practice areas in which Counterclaim Defendants have a significant

presence, C&C's practice only "overlaps" with essentially seven (7) of these practice areas – i.e.,

---

[19] Indeed, C&C has failed to specifically address how and the manner in which it has used "GLOBALAW" as a source identifier, the geographic extent of its use, and the time periods it has used the term "GLOBALAW" in each *unknown* geographic area.  Further, it has not provided competent summary judgment evidence of *any* use in most jurisdictions served by Counterclaim Defendants, such as Washington, D.C., Maryland, Pennsylvania, Colorado, Utah, Texas, Oregon, and the State of Washington.

business, estate planning & probate, family law, immigration, intellectual property, international

practice, and recovery – with approximately ten (10) other areas of *de minimis* practice by C&C –

i.e., appellate, biotechnology, commercial & secured transactions, government contracts,

insurance coverage, litigation, mergers and acquisitions, nonprofit organizations, state and local

taxation, and technology/emerging corporations.  *See id.*  Indeed, while C&C argues that it and

Counterclaim Defendants have some areas of mutual practice, *see* C&C's Opp'n to Countercl.

Defs.' Mot. for Summ. J. at 25, it also admits that it is on a completely different scale in

comparison to Counterclaim Defendants, noting that "C&C does not have the financial resources

that the four Counterclaim Defendants have," *id.* at 9.

Accordingly, it is clear that the relevant buyer classes served by C&C and Counterclaim

Defendants are distinguishable based on their size, clientele, and the specific legal services they

provide.  Counterclaim Defendants are simply a group of multinational law firms, with multiple

offices, hundreds of attorneys, with many times the clients possessed by C&C, with clients much

larger than those serviced by C&C, whose practices are significantly larger and broader than

C&C's practice.  C&C, in contrast, is a small, two-person law firm, with only one (1) member

who has passed a State Bar in the United States; its work, while perhaps significant and

challenging, serves a much smaller client base, a much smaller-sized client, in a much smaller

geographic area, by providing a significantly reduced spectrum of services.  Given the fact that

there is no significant overlap in the respective markets serviced by C&C and Counterclaim

Defendants, a significant number of third-parties employ the mark in question, C&C's

advertising in furtherance of the mark is unproven and *de minimis*, and C&C's use of the mark is

sporadic and inconsistent, it is plain that all relevant circumstantial evidence points to one fact –

that is, C&C has not established "secondary meaning" of the "GLOBALAW" mark. This conclusion is buttressed by the dearth of direct evidence provided by C&C relating to "secondary meaning," and the persuasive survey evidence undermining C&C's contention put forth by Counterclaim Defendants. As such, even *assuming* arguendo that "GLOBALAW" was not generic, but instead fell into the "descriptive" category of trademarks, the mark could not be protected by C&C because it has not demonstrated the necessary "secondary meaning." Accordingly, C&C's Count II and Count IV trademark infringement claims must – once again – fail.

3.      Assuming *Arguendo* that C&C Could Prove that "GLOBALAW" Was a Descriptive Term Over Which It Had "Secondary Meaning," Is There a Likelihood of Confusion Between C&C's Use and that of Counterclaim Defendants?

Even assuming *arguendo* that C&C had put forth sufficient evidence indicating that the term "GLOBALAW" was descriptive, not generic, *and* that "GLOBALAW" had acquired secondary meaning in the minds of the public as a reference to C&C, summary judgment on Counts II and IV of C&C's Counterclaim would still be warranted, as C&C has failed to satisfy its burden of putting forth evidence to establish that Counterclaim Defendants' use of the mark creates a "likelihood of confusion" of purchasers in the relevant markets. *See PRD*, 312 F. Supp. 2d at 13 ("The third prong of the *Sears, Roebuck* test [in the D.C. Circuit] asks 'whether the relevant purchasing public is likely to be confused by the use of the defendants' mark.'") (quoting *Malarkey-Taylor Assocs.*, 929 F. Supp. at 476); *accord Sands, Taylor & Wood Co. v. Qauker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992) ("The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or

services among the relevant class of customers and potential customers.") (citation omitted).[20]  It

is C&C's burden to prove that "an appreciable number of ordinarily prudent customers are likely

to be misled, or simply confused, as to the source" of the services in question.  *Nat'l Info. Corp.*

*v. Kiplinger Wash. Editors, Inc.*, 19 U.S.P.Q.2d 1948, 1949 (D.D.C. 1991) (quoting *Sears,*

*Roebuck & Co.*, 576 F. Supp. at 861).  A review of the two kinds of confusion at issue in this

case – i.e., (1) forward confusion, and (2) reverse confusion – illuminates C&C's clear failure to

demonstrate likelihood of confusion of the marks in question.

a.     *Forward Confusion*

Initially, this case was solely about "forward confusion."  That is, "when customers

mistakenly think that the junior user's goods or services are from the same source as or are

connected with the senior user's goods or services."  *Sands, Taylor & Wood Co.*, 978 F.2d at 957

(quoting 2 *McCarthy on Trademarks & Unfair Competition* § 23:1).  "Forward confusion" is the

"classic" doctrine, wherein "the junior user attempts to capitalize on the senior user's good will

and established reputation by suggesting that his product comes from the same source as does the

senior user's product."  *Id.* (citations omitted).  Under this claim, made explicit by C&C in

_____

[20] It might seem that because this Court has concluded that "GLOBALAW" is a generic
term, this section on "likelihood of confusion" is wholly extraneous.  *See Blinded Veterans*
*Ass'n*, 872 F.2d at 1043 ("If the name of one manufacturer's product is generic, a competitor's
use of that name, without more, does not give rise to an unfair competition claim under section
43(a) of the Lanham Act.") (citing *Liquid Controls Corp.*, 802 F.2d at 939).  However, this
Circuit has held that an unfair competition claim based upon a generic term can be supportable
(1) "if consumer confusion or a likelihood of consumer confusion arose from the failure of the
defendant to identify itself as the source of the product," *id.* (quoting *Liquid Controls Corp.*, 802
F.2d at 939); or (2) "if the competitor's failure adequately to identify itself as distinct from the
first organization causes confusion or likelihood of confusion," *id.* (citing *Liquid Controls Corp.*,
802 F.2d at 939-40).  Accordingly, it is necessary for this Court to proceed with a "likelihood of
confusion" analysis despite the fact that "GLOBALAW" is a generic term or – at best – is a
descriptive term over which C&C has completely failed to establish secondary meaning.

Counts II and IV of its Counterclaim,

> [t]he crucial focus of the inquiry is the effect of the defendant's mark on prospective purchasers.  If the [mark] is likely to have the effect of confusing purchasers into believing that the [defendant's mark] is somehow associated with [plaintiff's mark . . .] or if it would tend to cause purchasers to mistake the [defendant's mark] for [the plaintiff's mark] itself . . . the requirements for finding this element of infringement are satisfied.

*PRD*, 312 F. Supp. 2d at 13 (internal quotations and citations omitted).

In assessing the likelihood of confusion, courts within this Circuit consider approximately seven (7) factors, none of which is individually determinative.  *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 1044 (7th Cir. 2001) (noting that no single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented, although, in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important); *accord Packman*, 267 F.3d at 643 ("Although likelihood of confusion is a question of fact, the issue may be resolved on summary judgment where the evidence is 'so one-sided that there can be no doubt about how the question should be answered.'") (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996) (affirming summary judgment for defendant where there was "no reasonable likelihood that any significant number of consumers could mistake the defendant for the plaintiff")).  These factors include:  (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers.  *See PRD*, 312 F. Supp. 2d at 14; *Malarkey-Taylor Assocs.*, 929 F. Supp. at 477 (citing *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).  A review of these

factors highlights the weaknesses in C&C's argument.

i.      "GLOBALAW" Is a Weak Mark

"The strength of a mark refers to its distinctiveness or its tendency to identify the goods

sold under the mark as emanating from a certain source." *Nat'l Info. Corp.*, 19 U.S.P.Q.2d at

1950 (citation omitted).  As such, "[t]he strength of a trademark encompasses both the mark's

inherent distinctiveness, or its arbitrariness in relation to the product for which it is used, and its

'acquired distinctiveness,' or 'the extent to which prominent use of the mark in commerce has

resulted in a high degree of consumer recognition.'" *Info. Superhighway, Inc.*, 395 F. Supp. 2d at

52 (citation omitted).  As the Court has repeatedly emphasized, "GLOBALAW" is a generic

term, or – at best – is a descriptive mark.  Marks falling within the descriptive category are

considered to be non-distinctive and weak under trademark law.  *TCPIP Holding Co. v. Haar*

*Commc'ns*, 244 F.3d 88, 93 (2d Cir. 2001).  In addition, C&C has failed to establish secondary

meaning – i.e., it has failed to show that the term "GLOBALAW" identifies the services sold

under the mark as emanating from a certain source.  *See Nat'l Info. Corp.*, 19 U.S.P.Q.2d at 1950

(the mark "PERSONAL FINANCE" was judged to be "relatively weak" where the plaintiff was

"unable to establish that the term 'personal finance' has become associated exclusively in the

public's mind with plaintiffs' Personal Finance newsletter").  Accordingly, it is clear that the

term "GLOBALAW" is a weak mark, arguing against likelihood of confusion.

ii.      The Overall Impression Created By the Marks Is Different

While it might initially appear as though the two marks in question – "GLOBALAW,

Inc." and "GLOBALAW Limited" – are virtually identical and therefore "similar," "[i]n

determining whether two marks are similar, the comparison is made "'in light of what happens in

80

the marketplace, [and] not merely by looking at the two marks side-by-side.'" *Packman*, 267

F.3d at 643 (quoting *Ty., Inc.*, 237 F.3d at 898); *see also Fed'n Internationale de Football Ass'n*

*v. Nike, Inc.*, 68 U.S.P.Q.2d 1849, 1855 (D.D.C. 2003) (same).   Courts must take into account all

the factors that potential purchasers are likely to perceive and remember.  *See Lang v. Ret. Living*

*Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991) (finding the general impression of marks to differ

significantly where both used additional words, different typefaces, and were placed in different

locations).   Even if the marks are composed of the same words and are pronounced the same,

they may be distinguished by the use of a company name in close proximity, the use of different

font sizes, and dissimilar modes of presentation.  *See King of the Mountain Sports v. Chrysler*,

185 F.3d 1084, 1090-91 (10th Cir. 1999) (finding marks with same dominant text portion to be

dissimilar due to differences in style, presentation, and visual impact).

        In this case, despite the fact that both C&C and Counterclaim Defendants employ the

term "GLOBALAW," their respective uses of the term are essentially dissimilar in their overall

impressions.   As this Court has noted, C&C's use of "GLOBALAW" varies considerably.   First,

on some occasions C&C has utilized the term to denote "GLOBALAW" as some kind of

"division" of C&C.   *See* Countercl. Defs.' Mot. for Summ. J., Ex. 14 (2003 letter from C&C ).

Second, on other occasions, C&C has employed the mark on its letterhead to denote that C&C

are "Administrators of GLOBALAW – A Worldwide Network of Independent Law Firms."   *See*

Countercl. Defs.' Mot. for Summ. J., Ex. 13 (4/11/00 C&C Letter).   Third, C&C – at times – has

used the term "GLOBALAW" as a synonym or trade name for itself.   *See also* Chotvacs Decl. ¶

3 & Ex. U (screen shot of www.globalaw.com).   ("GLOBALAW is an international law firm

assisting its clients in their foreign legal matters through its network of members in 85 countries.

81

Break the time, language and cultural barriers.  Call GLOBALAW with your foreign legal questions.").

In contrast, the Counterclaim Defendant law firms – BSAI, JW, and GSB – do not provide services under the designation "GLOBALAW."  *See* Birkeland Decl. ¶ 5(b).  Indeed, they use the term only to denote their membership in the "GLOBALAW Limited" network of law firms.  *Id.*  While C&C has – at times – claimed that it uses the term in a similar way, to denote its alleged administration of a "worldwide network of independent law firms," C&C has completely dropped this alleged usage, arguing:

> Carmon is not here claiming a network of lawyers.  It is asserting that the GLOBALAW service mark identifies the source of the firm's legal services. Haggai Carmon repeatedly affirmed and reaffirmed in his depositions that GLOBALAW is the same as Carmon and Carmon – it is the name the firm uses to identify itself in the practice of law and its services.  (Exh. 11).  Counterclaim Defendants['] attempt to erect a straw horse network issue so they can knock it down in their memorandum.  Carmon does not lay claim to infringement or monetary award relating to a network owned, operated by, or conducted by Carmon & Carmon.  Whether there was or is a group of law firms Carmon has worked with in the past or works with now in the form of a network, is irrelevant to the infringement and monetary award sought in this case.

C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 9-10; *see also id.* at 12 n.4 ("Globalaw, Inc. was merely a service company and ceased to operate several years ago.  It never had a network.").  Accordingly, per C&C's explanation, the one apparent area of overlap actually is simply non-existent.

Moreover, Counterclaim Defendants' reference to their "GLOBALAW" network is always in conjunction with the prominent use of their firm names – Ballard Spahr Andrews & Ingersoll, Jackson Walker, and Garvey Schubert Barer.  *See* Birkeland Decl. ¶ 5(b).  In doing so, each of the Law Firms continues to retain its individual identity through the constant use of its

own unique marketing materials in connection with reference to their membership in the greater association. Perhaps more importantly, "GLOBALAW Limited" itself provides no services to the *public* under the name "GLOBALAW"; rather, it simply provides an umbrella of services to the member firms. *Id.* ¶ 5(a). In addition, its presentation of the term "GLOBALAW" is also different from C&C's, *compare* www.globalaw.com with www.globalaw.net, and the overall impression conveyed by Counterclaim Defendants' use of the term "GLOBALAW" is in connection with an association of law firms – something distinct from the connection propounded by C&C. *See Fed'n Internationale*, 69 U.S.P.Q.2d at 1855 (noting that even if the plaintiff's overall stylized mark was considered very strong, the defendant's use of the words in a different graphical context made the likelihood of confusion minimal).

As such, given the different usages and presentation of the term "GLOBALAW" by C&C and Counterclaim Defendants, it is evident that the terms, while initially appearing to be similar, are legally distinctive. It is simply not likely that consumers will confuse Counterclaim Defendants' association of large, well-known, multi-national law firms, nor any of Counterclaim Defendants individually, with C&C's "GLOBALAW" division or law firm. Accordingly, this factor also cuts against a finding of likelihood of confusion.

### iii.    The Services Are Not Proximate and Do Not Compete

"'This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.'" *Savin Corp. v. Savin Group*, 391 F.3d 439, 458 (2d Cir. 2004) (quoting *Lang*, 949 F.2d at 582). However, when there is competitive distance between the firms and/or services, consumers are not likely to be

confused. *Id.* "In assessing this factor, 'the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal.'" *Id.* (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993); citing *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (holding that customers were not likely to be confused when both parties sold staplers in the same stores, but one party sold a pneumatic stapler and the other a lightweight small stapler)).

Here, because C&C no longer alleges a network, and has produced no evidence to indicate that any such once-asserted network currently exists with U.S. members, there is no competition between it and Counterclaim Defendant GLOBALAW Limited.  Moreover, the nature and scope of C&C's law practice is significantly different from the practice of Counterclaim Defendants BSAI, JW, and GSB.  As noted previously, there is simply minimal overlap between the services offered.  C&C's services are very narrow in scope, befitting a two-person law firm, with the majority of its practice devoted to international and immigration law, with the majority of its clients being Israeli citizens.  *See* HC at 73-76, 523-24; RC at 13-16.  In contrast, the Law Firms named as Counterclaim Defendants by C&C are all large firms with multiple offices providing services in almost every area of corporate and civil law.  *See* Birkeland Decl. ¶¶ 2-3.  Moreover, the geographic distribution of the services do not overlap to any significant degree, as C&C is almost entirely concentrated in the greater New York City area and Israel, while the Law Firms named as Counterclaim Defendants are not headquartered in New York, nor do they maintain offices in Israel.  Given the great disparity in the parties' legal services, locations, and capabilities, one cannot say that C&C and the Law Firms provide competing legal services.  *See, e.g.*, *CareFirst v. First Care*, 350 F. Supp. 2d 714, 724 (E.D. Va.

2004) (finding no competitive proximity between a large health insurance company serving customers all over the country and a group of eleven (11) doctors providing traditional family care in a limited area); *24 HR Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, No. 03 Civ. 4069, 2005 WL 991767, at *11 (S.D.N.Y. Apr. 28, 2005) (finding that consumers would not be confused as to the source of services between a large, well-known fitness center and a smaller one).

Additionally, there is little likelihood that C&C will – or can – bridge the gap between its market and Counterclaim Defendants' market. *See Savin Corp.*, 391 F.3d at 459-60; *see also W.W.W. Pharm. Co.*, 984 F.2d at 574 ("This factor is designed to protect the senior user's interest in being able to enter a related field at some future time.") (citation and internal quotation marks omitted). First, C&C's weak claim that "it is not difficult to imagine" that it will enter Counterclaim Defendants' market in the future, or that consumers would perceive that C&C would, *see* C&C's Theory of Recovery at 8, is a bare, speculative assertion that fails to raise a triable issue of fact. *See Savin Corp.*, 391 F.3d at 459 (affirming the holding that the bare assertion of intent to enter into the market fails to raise a genuine issue of material fact that the plaintiff was likely to enter the defendants' corner of the marketplace); *Lang*, 949 F.2d at 582 (finding the publisher's unrealized plans to publish self-help guides were wholly speculative, meaning that the publisher was unlikely to "bridge the gap"); *Horn's Inc. v. Sanofi Beaute, Inc.*, 43 U.S.P.Q.2d 1008, 1015-15 (S.D.N.Y. 1997) ("Since plaintiff has not shown that its plans to enter the fragrance market are more than 'wholly speculative,' this factor militates against finding a likelihood of confusion."). Second, given its size and the narrow scope of its practice, C&C simply lacks the capacity to compete in the market that Counterclaim Defendants serve.

85

C&C is a husband and wife partnership, with only one (1) member who has passed a State Bar

Examination in the United States and fewer than a few dozen active files (virtually all of which

involve immigration or U.S. government matters relating to Israel); indeed, C&C admits that it is

a small operation with limited means, *see* TTAB at 63, that now has more clients than it can

handle, *see* RC at 15-16, 36; HC at 73, 75.  C&C is simply different than GLOBALAW Limited,

which is an actual network of over seventy (70) law firms, as the only U.S. firm with which C&C

ever had a connection ceased to exist in the United States years ago and C&C itself has now

dropped all "network" claims.  Moreover, C&C is vastly different from the Counterclaim

Defendant Law Firms, which are large, multi-office, all-purpose law firms providing legal

services in numerous jurisdictions to a variety of sophisticated buyers.  Given these differences,

there is simply no evidence that a small law firm consisting of two (2) attorneys can compete on

the scale and in the markets of Counterclaim Defendants.  *See Programmed Tax Sys., Inc. v.*

*Raytheon Co.*, 439 F. Supp. 1128, 1133 (S.D.N.Y. 1977) (finding no evidence to support the

claims that a small, service-oriented business would develop the sophisticated and highly

expensive manufacturing capacity necessary to produce computers and thus bridge the gap).[21]

Given these considerations, it is evident that the market served by C&C and Counterclaim

Defendants is not proximate; they do not compete against each other, and this gap is not likely to

be bridged.  Accordingly, this factor also weighs against the finding of a likelihood of confusion.

     iv.     <u>There Is No Evidence of Actual Confusion</u>

The absence of actual confusion can be highly effective in showing a low likelihood of

---

[21] Indeed, despite two (2) decades of existence, C&C has failed to "bridge the gap," a fact that undermines any foundation for its speculative assertions.

confusion if there has been ample opportunity for customer confusion. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 559 F.2d 1126, 1136 (2d Cir. 1979); *see also Cohn v. Petsmart, Inc.*, 61 U.S.P.Q.2d 1688, 1691 (9th Cir. 2002) (finding little likelihood of confusion where parties used the same trademark in the same market for six (6) years with no instances of actual confusion). Here, C&C and Counterclaim Defendants have concurrently used the term "GLOBALAW" for years, as Dennis Campbell began using the term in at least January 1994, while C&C claim that they began using the term in 1987 or 1988. Despite this overlap, C&C has not produced a single occurrence of actual customer confusion. Moreover, C&C has offered no customer survey evidence to show a likelihood of confusion – which also weighs against a finding of actual confusion. *See Merriam-Webster, Inc. v. Random House, Inc.*, 32 U.S.P.Q.2d 1010, 1015 (2d Cir. 1994) (holding that a plaintiff's failure to offer a survey showing the existence of confusion is evidence that a likelihood of confusion cannot be shown) (citing *Essence Commc'ns v. Singh Indus.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988)). Accordingly, this important factor also argues against a finding of a likelihood of confusion.

> v.    Counterclaim Defendants' Use Has Been in Good Faith

The next factor to be considered in the "likelihood of confusion" analysis is whether the Counterclaim Defendants' use of the mark in question has been in good faith. "This factor considers 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Arrow Fastener Co.*, 59 F.3d at 397 (quoting *Lang*, 949 F.2d at 583). Under this analysis, "[p]rior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Id.* (citing *Lang*, 949 F.2d at 583-84); *Sweats Fashions,*

*Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed. Cir. 1987) (finding that, on review of a

grant of summary judgment in a USPTO opposition proceeding, "[opposer] would have us infer

bad faith because of [registrant's] awareness of [opposer's] marks.  However, an inference of

'bad faith' requires something more than mere knowledge of a prior similar mark.  That is all the

record here shows."); *but see Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259

(2d Cir. 1987) (noting that in determining a defendant's intent, "actual or constructive

knowledge" of the prior user's mark or trade dress may indicate bad faith).

      Three facts undermine C&C's claims with respect to the alleged "bad faith" of

Counterclaim Defendants.  First, C&C has presented absolutely no evidence – whether in the

form of advertisements, press releases, testimony from C&C's customers and clients, or

testimony from the relevant purchasing public – that Counterclaim Defendants have ever

attempted to pass themselves off as C&C's "GLOBALAW," or use the term an attempt to benefit

from C&C's reputation and goodwill.  *See, e.g.*, Birkeland Decl. ¶ 10.  Indeed, given the history,

size, and substantial reputations behind the Counterclaim Defendant Law Firms, such an

attempted "passing off" seems quite unlikely in this case, especially given the vast differences

between Counterclaim Defendants and C&C, a small, relatively new, narrowly-tailored firm.

      Second, it is clear that Counterclaim Defendants' selection of the mark reflects

GLOBALAW Limited's actual characteristics, i.e., an association with international law.  As

various courts have held, "[a] finding of good faith may be supported by, among other things,

'[s]election of a mark that reflects the product's characteristics.'" *Arrow Fastener Co.*, 59 F.3d at

397 (quoting *Lang*, 949 F.2d at 583).

Third, as the Second Circuit has stressed, even assuming *arguendo* the prior knowledge

of a senior user's mark, the "exclusive right to use a registered mark extends only to the goods

and services noted in a registration certificate." *Id.* (citing *McGregor-Doniger*, 599 F.2d at

1137). Here, leaving aside the important facts that (1) Counterclaim Defendants actually filed

the first accepted trademark application with the USPTO, and (2) no "GLOBALAW" mark has

been successfully registered, it is clear that the parties' applications reflected *different* services.

In November 1994, Dennis Campbell – on behalf of GLOBALAW Limited – filed an application

in the United States Patent and Trademark Office requesting federal registration of the service

mark "GLOBALAW" for "association services." *See* DC at 29; Birkeland Decl. ¶ 6. Following

Campbell's valid application, C&C filed a U.S. application for registration of the name

"GLOBALAW" for "foreign and international legal services" on February 3, 1995. *See*

Birkeland Decl. ¶ 6; *see also* USPTO website, *available at* http://www.uspto.gov (wherein C&C,

in Reg. No. 74629447, states that is registering the term under International Class 035, for

"foreign and international legal services"). This key difference undermines C&C's "bad faith"

claim, as it appears that the parties' were directing their usages towards different services.

Despite these significant considerations, C&C persists in its "bad faith" claim by arguing

that because the Asset Transfer Agreement between Campbell and the Counterclaim Defendant

Law Firms did not reference the United States, and because Campbell has since claimed that he

did not have rights to the name "GLOBALAW" within the United States, then Counterclaim

Defendants' usage must be in bad faith. *See* C&C's Opp'n to Countercl. Defs.' Mot. for Summ.

J. at 18; *cf.* Birkeland Decl. ¶ 9 & Ex. 4 (Asset Transfer Agreement); *see also* C&C's Opp'n to

Countercl. Defs.' Mot. for Summ. J., Ex. 4 (same).[22]  Such an assertion, as noted, is not

necessarily relevant to the "bad faith" analysis for the purposes of the "likelihood of confusion"

examination; moreover, it strains logic, and is simply without any support.  Simply, BSAI, JW,

and GSB began to use the term "GLOBALAW" when they entered into licensing agreements

with Dennis Campbell.  *See, e.g.*, Brown Decl., Ex. 2 (9/14/98 Understanding Between Campbell

and BSAI); Birkeland Decl., Ex. 2 (1/18/94 Understanding Between Campbell and JW); Fernald

Decl., Ex. 2 (2/14/01 Understanding Between Campbell and GSB).  The Counterclaim Defendant

Law Firms had substantially the same rights granted to them from Mr. Campbell when they

joined the network and had every reason to believe those rights were valid.  Indeed, Mr.

Campbell represented himself to be the "owner of the rights to the trademark GLOBALAW" in

all licensing agreements, and he explicitly granted each firm a license to use the designation.  *Id.*

This situation did not change when Campbell and GLOBALAW Limited executed their Asset

Transfer Agreement, pursuant to which Campbell transferred all assets that were used in the

operation of the network, not excluding the trade name.  *See* Birkeland Decl. ¶ 9 & Ex. 4 (Asset

---

[22] Interestingly, in its Counterclaim, C&C originally alleged that Mr. Campbell – in 1993 – had

> sent a letter to Carmon & Carmon seeking cooperation and a meeting in New York.  As a result, a Globalaw membership kit was delivered to Campbell by Carmon & Carmon.  Subsequently, Carmon & Carmon found out that Campbell had registered the Mark, "Globalaw," for himself in Austria on August 17, 1994, and then tried in 1994, based on the Austrian registration, to obtain a U.S. registration of the Mark for himself.

C&C's Counterclaim ¶ 41.  C&C has since dropped this assertion in responding to Counterclaim Defendants' Motion for Summary Judgment, presenting no evidence on the matter and not arguing it pursuant to its "bad faith" theory.

Transfer Agreement).  Obviously, Campbell's pre-2002 assets in the United States could not be

definitively transferred to Counterclaim Defendants and listed as part of Exhibit A ("Transferred

Assets") of the 2002 Asset Transfer Agreement due to the fact that those U.S.-based "assets"

were encumbered and/or contingent upon certain legal findings.  *Id.* at Ex. B ("Exceptions to

Representations and Warranties"; plainly noting that "[t]here is no pending or prospective

litigation involving Globalaw *other than that relating to the Globalaw name in the United

States*.") (emphasis added).  However, Campbell certainly passed on his interest in those

supposed U.S.-based assets in 2002 to Counterclaim Defendants, to the extent that such an

interest actually exists.  Accordingly, whatever Campbell may or may not have known, it is clear

that Counterclaim Defendants acted in the "good faith" belief that they had a claim to the mark in

question.  Given the three (3) above-described considerations, as well as the "good faith" belief

in their claim to the mark, the Court concludes that this factor also cuts against finding a

"likelihood of confusion" between the marks.

> vi.  The Quality of Counterclaim Defendants' Product Is High

"This factor is primarily concerned with whether the senior user's reputation could be

jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Arrow

Fastener Co.*, 59 F.3d at 398 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799

F.2d 867, 875 (2d Cir.1986)).  Here, Counterclaim Defendants have presented substantial

evidence suggesting that (1) GLOBALAW Limited itself is an exclusive associational network,

with publicly-listed members who actively participate in regular meetings and provide a wide

range of services; and (2) the Counterclaim Defendant Law Firms themselves – BSAI, JW, and

GSB – are large, well-regarded firms with many lawyers selected as "Leaders in Their Field" or

*The Best Lawyers in America* and rated by Martindale-Hubbell. *See* Chotvacs Decl. ¶¶ 5-8;

Birkeland Decl. ¶ 2; Lieberworth Decl. ¶¶ 2-3. C&C does not contest this evidence, nor has it

controverted Counterclaim Defendants' claims that they provide high quality – rather than

inferior – services to the purchasing public. Accordingly, the Court finds that this factor also

weighs against finding a "likelihood of confusion" as asserted by C&C.

vii.   <u>Sophistication of the Purchasers</u>

The final factor of the "likelihood of confusion" analysis looks at the sophistication of the

buyers of the parties' services. "In assessing this factor, one must look to 'the general impression

of the ordinary purchaser, buying under the normally prevalent conditions of the market and

giving the attention such purchasers usually give in buying that class of goods.'" *Merriam-*

*Webster*, 35 F.3d at 72 (citation omitted). This factor is "based upon a notion that

unsophisticated buyers increase the likelihood of confusion." *Centaur Commc'ns*, 830 F.2d at

1228. There is always less likelihood of confusion when products or services are expensive and

are purchased after careful consideration. *See Astra Pharm. Prods., Inc. v. Beckman Instruments,*

*Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983).

Here, the services offered by Counterclaim Defendants are unique and expensive, and

their nature involves discriminating purchasers. Membership in GLOBALAW Limited is

exclusive – both on the part of the association and would-be members. *See* Birkeland Decl. ¶

5(b). GLOBALAW Limited's U.S. members pay at least $7,000.00 in membership dues each

year. *Id.* ¶ 5(d). Moreover, the legal services provided by all firms in this case – both C&C and

the Counterclaim Defendant Law Firms – typically cost in the hundreds of dollars per hour, and

are the types of services about which customers take a high degree of care in purchasing. *See*

92

Chotvacs Decl. ¶ 10; Birkeland Decl. ¶ 11.  Due to the nature of the services being offered, the

Counterclaim Defendants, for example, typically serve larger corporations, which exercise

considerable sophistication in deciding on counsel to whom they entrust their legal affairs.  *Id.*

While not made plain by C&C, Haggai Carmon's Affidavit also reflects that C&C's clients are

often "corporations" and "the United States Government" – two sets of parties that typically are

quite sophisticated.  *See* 11/28/05 Haggai Carmon Aff. ¶ 9.  Given these considerations, it

appears evident that the buyers of the parties' services are quite sophisticated, thereby

minimizing the danger of any confusion between C&C and Counterclaim Defendants.  As such,

this factor also cuts against a finding of a "likelihood of confusion."

viii.   <u>Summary</u>

In sum, an analysis of the relevant "likelihood of confusion" factors typically addressed in

this Circuit leads to the inexorable conclusion that – as a matter of law – there is no likelihood of

confusion created by the Counterclaim Defendants' use of the term "GLOBALAW."  First,

assuming *arguendo* that "GLOBALAW" is not generic, it is a weak descriptive mark with no

connection to C&C through secondary meaning.  Second, the impression created by the marks

used by C&C and Counterclaim Defendants are distinct, as the parties simply do not provide

competing legal services or employ the term "GLOBALAW" in a legally similar manner.  Third,

the parties serve vastly different markets, and it is unlikely that C&C will enter the markets

served by Counterclaim Defendants.  Fourth, C&C has presented absolutely no evidence of

actual confusion.  Fifth, there is no showing that Counterclaim Defendants adopted the

designation "GLOBALAW" with anything but good faith; moreover, there is no evidence

indicating that Counterclaim Defendants ever attempted to pass themselves off as C&C or trade

93

on its reputation.  Sixth, Counterclaim Defendants provide high-quality legal services, and are

unlikely to injure or harm the reputation accrued by C&C.  Seventh, and finally, due to the

unique and expensive nature of the services involved, the potential purchasers of the relevant

services are likely to be discriminating, selective, and well-informed.  Based upon a

consideration of the totality of these factors, and a balancing of the evidence presented, the Court

concludes that confusion between C&C and Counterclaim Defendants is highly unlikely.  As

such, because C&C cannot establish (1) that its mark is protectable, and not generic; (2) that the

mark, even if descriptive, has accrued secondary meaning linking the term to C&C in the minds

of the purchasing public; and (3) that there is a likelihood of confusion between C&C and

Counterclaim Defendants in the use of their marks, Counterclaim Defendants' Motion for

Summary Judgment as it relates to C&C's trademark infringement claims contained within

Counts II and IV of its Counterclaim must be granted, and those counts dismissed.

b.  *Reverse Confusion*

Despite the fact that its Counterclaim focused on "forward confusion," C&C's

Opposition to Counterclaim Defendants' Motion for Summary Judgment attempts to belatedly

add a new claim related to its trademark infringement assertion – "reverse confusion."  *See*

C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 12-14.  "Reverse confusion occurs when

a large junior user saturates the market with a trademark similar or identical to that of a smaller,

senior user.  In such a case, the junior user does not seek to profit from the good will associated

with the senior user's mark."  *Sands, Taylor & Wood Co.*, 978 F.2d at 957.  Despite the fact that

the junior user does not seek to pass itself off as the senior user, or benefit from the senior user's

good will, the theory of "reverse confusion" recognizes that the senior user may still be injured

94

because

> [t]he public comes to assume that the senior user's products are really the junior
> user's or that the former has become somehow connected to the latter.  The result
> is that the senior user loses the value of the trademark – its corporate identity,
> control over its goodwill and reputation, and ability to move into new markets.

*Id.* (citing *Ameritech, Inc. v. Am. Info. Tech. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987); *Banff, Ltd.*

*v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490-91 (2d Cir. 1988); *Big O Tire Dealers, Inc. v.*

*Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir. 1977)).  Upon a review, it is plain

that multiple problems undermine C&C's new-found "reverse confusion" assertion.

First, while citing cases from other Circuits to support its "reverse confusion" argument,

C&C fails to address the fact that neither this Court nor the D.C. Circuit has recognized "reverse

confusion" as the basis for a claim under the Lanham Act, or specifically under Section 43(a).

Nor does C&C offer any reason or case law for why this Court should adopt such a position.

Second, given that various courts outside of this jurisdiction have held that "the

objectives of the Lanham Act – to protect an owner's interest in its trademark by keeping the

public free from confusion as to the source of goods and ensuring fair competition – are as

important in a case of reverse confusion as in typical trademark infringement," *Banff, Ltd.*, 841

F.2d at 490, it might well be necessary to undertake a precautionary analysis of C&C's "reverse

confusion" claims.  However, even assuming a "reverse confusion" cause-of-action within this

Circuit, it is clear that C&C's "reverse confusion" argument runs into several fatal problems:  (1)

C&C has presented absolutely no affirmative evidence of any "reverse confusion," failing to

attach any purchasing public surveys or any testimonials from its own customers regarding any

such confusion; (2) the only affirmative evidence relating to confusion – Counterclaim

Defendants' Recognition Survey – reveals that the purchasing public and relevant practitioners

do not associate *either* of the parties with the term "GLOBALAW"; instead, the term appears

wholly generic, with no forward or reverse confusion linking the term to either C&C or

Counterclaim Defendants; (3) C&C has produced no evidence indicating a "saturation campaign"

by Counterclaim Defendants that seeks to overwhelm the marketplace through advertising with

the term "GLOBALAW," *see McCarthy on Trademarks & Unfair Competition* § 23:10 author's

cmt. (stating that "the paradigm case is that of a knowing junior user with much greater economic

power who saturates the market with advertising of a similarly confusing mark, overwhelming

the marketplace power and value of the senior user's mark.  When the facts vary from that

model, the reverse confusion rule is *not applicable*.") (emphasis added); and (4) as discussed in

the previous "forward confusion" subsection, the parties employ the term "GLOBALAW" in

dissimilar ways across separate and distinct markets; indeed, unlike C&C, Counterclaim

Defendants never hold out their services to the public as emanating from "GLOBALAW," and

any use of the word "GLOBALAW" is always accompanied by the prominent public display of

the individual member firm's name, *see AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 796-97

(6th Cir. 2004) ("[T]he POWERZONE mark's consistent proximity to Radio Shack's house

mark is significant.  The use of a challenged junior mark together with a house mark or house

tradename can distinguish the challenged junior mark from the senior mark and make confusion

less likely."); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("Warner-

Lambert's prominent use of its well-known house brand therefore significantly reduces, if not

altogether eliminates, the likelihood of confusion that consumers will be confused as to the

source of the parties' products.").  Simply, based upon these considerations and the discussion

96

held in the previous "forward confusion" section, it is plain that there has been no actual

confusion between the parties, nor is confusion – whether reverse or forward – likely.

Accordingly, even if this Circuit were to recognize a claim of "reverse confusion" emanating

from either the Lanham Act or the common law, C&C's new-found claim would be without

foundation.

> C.      *Count III of C&C's Counterclaim – Federal Unfair Competition Comprising*
> *False and Misleading Statements of Fact Under Section 43(a) of the Lanham Act,*
> *15 U.S.C. § 1125(a)*

The final count left in C&C's Counterclaim – Count III – contends that "[b]y advertising

that it has rights in the Service Mark, 'Globalaw,' counterclaim defendants made false and

misleading representations to the public, misrepresenting the nature of its services in violation of

Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)."  C&C's Counterclaim ¶ 63.

Section 43(a)(1)(B) provides:

> Any person who, on or in connection with any goods or services . . . uses . . . any
> false designation of origin, false or misleading description of fact, or false or
> misleading representation of fact, which . . .
>
> > (B) in commercial advertising or promotion, misrepresents the nature,
> > characteristics, qualities, or geographic origin of his or her or another
> > person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  To survive a motion to dismiss or for judgment on the pleadings of

such a claim, the plaintiff must allege that the defendant "made statements of fact in [its]

commercial advertising promotion that were (1) false or misleading, (2) actually or likely

deceptive, (3) material in their effects on buying decisions, (4) connected with interstate

commerce, and (5) actually or likely injurious to the plaintiff." *Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 592 (D.D.C. 1995) (citing *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990); *Barr Labs., Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 117 (E.D.N.Y. 1993)).  "A Lanham Act plaintiff must allege and prove that an alleged false or misleading representation of fact was 'literally false or misleading to the public' or 'verifiably' false or misleading." *Id.* (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229, 231 (3d Cir. 1990)).

However, based on the facts of this case, C&C cannot satisfy its Section 43(a)(1)(B) burden.  Importantly, C&C's Count III claim is predicated on its claim to have exclusive rights in the term "GLOBALAW," such that Counterclaim Defendants are prohibited from using the term in commerce – which is duplicative of Counts II and IV of its Counterclaim.  *See* C&C's Counterclaim ¶¶ 63-64.  As discussed in extensive detail in Section III(B) of this Memorandum Opinion, C&C does not have protectable trademark rights in the term "GLOBALAW."  As such, Counterclaim Defendants have not misrepresented the nature of their services by denoting their membership in GLOBALAW Limited.  Moreover, because no likelihood of confusion exists between the marks and their uses by the parties, C&C cannot establish that Counterclaim Defendants' commercial statements and promotions were "actually or likely injurious" to it. Finally, because the term is generic, or – at best – descriptive with no secondary meaning, C&C has no way of showing that Counterclaim Defendants' commercial usage had a "material effect" on the buying decisions of the purchasing public.  Given these key failures in light of the relevant test, it is plain that Counterclaim Defendants are also entitled to summary judgment with respect

to Count III of C&C's Counterclaim.[23]

>    D.    *C&C's Motion to Reconsider the November 14, 2005 Opinion and Order of Magistrate Judge Alan Kay and C&C's Motion for Further Discovery Pursuant to Federal Rule of Civil Procedure 56(f)*

C&C attempts to avoid summary judgment through both its Motion to Reconsider the November 14, 2005 Opinion and Order of Magistrate Judge Alan Kay and its Motion for Further Discovery Pursuant to Federal Rule of Civil Procedure 56(f).  These two motions are related, as in C&C's Opposition to Counterclaim Defendants' Motion for Summary Judgment claims that Counterclaim Defendants' summary judgment is "premature," as "[d]iscovery is needed by Carmon in order to respond fully to the motion," *see* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at 1, while Magistrate Judge Kay's November 14, 2005 Opinion and Order – issued after this filing by C&C – essentially denied C&C's motions to compel the "remaining" discovery identified by C&C in its Opposition/Rule 56(f) Motion.

Local Civil Rule 72.2(b) states that "[a]ny party may request the judge to reconsider a magistrate judge's ruling under paragraph (a) by filing a motion to reconsider within 10 days[.]"  Local Civil Rule 72.2(c) sets forth the basis for reconsideration, stating that "a judge may modify or set aside any portion of a magistrate judge's order under this Rule found to be clearly

---

[23] Given that the Court has granted Counterclaim Defendants' Motion for Summary Judgment with respect to each count set forth in C&C's Counterclaim, the Court need not address the merits of Counterclaim Defendants' Objections and Motion to Strike Evidence Submitted in Support of Counterclaim Plaintiffs' Response to Counterclaim Defendants' Motion for Summary Judgment.  While it is clear that much of the so-called "evidence" set forth in the summary judgment record by C&C is quite problematic and could be stricken, even assuming *arguendo* the validity of that evidence for the purposes of this motion, Counterclaim Defendants' Motion for Summary Judgment must be granted.  Accordingly, while Counterclaim Defendants' Motion to Strike Evidence may have some merit, it shall be denied without prejudice as moot at this time.

erroneous or contrary to law." *See also* Fed. R. Civ. P. 72(a) ("The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be *clearly erroneous or contrary to law*.") (emphasis added). A court should make such a finding when "'on the entire evidence' the court 'is left with the definite and firm conviction that a mistake has been committed.'" *Neuder v. Battelle Pac. Northwest Nat'l Lab.*, 194 F.R.D. 289, 292 (D.D.C. 2000) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 365, 68 S.Ct. 525, 92 L.Ed. 746 (1948)); *see also Gluck v. Ansett Australia*, 204 F.R.D. 217, 218 (D.D.C. 2001).

Furthermore, a motion for reconsideration is "not simply an opportunity to reargue facts and theories upon which the court has already ruled." *United States v. Funds from Prudential Sec.*, 245 F. Supp. 2d 41, 44 (D.D.C. 2003) (quoting *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995)). Nor is it "a vehicle for presenting theories or arguments that could have been presented earlier," *id*. at 38, or a method of introducing evidence that was "available but not offered at the original motion or trial," *Natural Res. Def. Council, Inc. v. United States Envt'l Prot. Agency*, 705 F. Supp. 698, 702 (D.D.C. 1989), *vacated on other grounds*, 707 F. Supp. 3 (D.D.C. 1989). Indeed, "[p]arties must take before the magistrate, not only their best shot, but all of their shots." *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

Here, C&C makes approximately three major objections in its Motion for Reconsideration. Upon a review, it is clear that each objection is without merit and is essentially both moot and irrelevant following this Court's ruling regarding Counts I-IV of C&C's now-dismissed Counterclaim.

First, C&C claims that "dispositive facts were ruled on in the opinion by Magistrate Judge Kay," contravening the limited referral made by this Court.  C&C's Mot. for Recons. at 3-4 & n.2.  According to C&C, Magistrate Judge Kay's decision wrongfully "rules on certain important dispositive fact issues, such as willful infringement, bad faith infringement, and damages suffered by Carmon by the infringement of its Mark GLOBALAW."  *Id.* at 3.  However, the Court repeatedly authorized Magistrate Judge Kay to hear and dispose of *all* "discovery-related" disputes in this litigation.  *See* [Docket Entry Nos. 99, 132, and 140].  Pursuant to the Court's previous orders, the discovery disputes at the heart of C&C's Motion for Reconsideration and its Rule 56(f) Motion were specifically referred to Magistrate Judge Kay for hearing and disposition.  His subsequent November 14, 2005 Order addressed only the matters before him, and despite C&C's assertions to the contrary, it did not purport to dispose of any other pending matters, i.e., Counterclaim Defendants' Motion for Summary Judgment.  In fact, Magistrate Judge Kay's Opinion even goes so far as to state that, "This denial is without prejudice in the event the trial court's ruling on any pending dispositive motions, involving overlapping issues, is inconsistent with this Court's findings."  11/14/05 Kay Opinion at 2.  Moreover, Magistrate Judge Kay's Opinion clearly limited itself to those discovery-related matters referred to him by this Court – simply because he concluded that allowing additional discovery beyond that already authorized would deny Counterclaim Defendants the protection that they deserve does not mean that he ruled on dispositive issues.  *See Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (finding that the magistrate judge did not exceed his authority under 28 U.S.C. § 636(b)(1)(A) simply because he found that further discovery was not required).  Moreover, even assuming *arguendo* that Magistrate Judge Kay may

have touched on some dispositive issues, it is clear that this Opinion does not rely on Magistrate

Judge Kay's "facts" or "conclusions" relating to such issues.

Second, C&C complains that Magistrate Judge Kay's Opinion "contains factual errors

and misleading statements." C&C's Mot. for Recons. at 5. Essentially, C&C spends a

significant amount of time in its Motion for Reconsideration contending that Magistrate Judge

Kay's "Background Facts" section setting out the history of this dispute, and what "rights" the

parties might have to the mark "GLOBALAW," is inaccurate. *See id.* at 5-15. The Court notes

that (1) Magistrate Judge Kay's "Background" section is not particularly relevant to his later

discussions of the parties' discovery-related disputes, and his ultimate resolution of those

disputes does not depend – in large part – on any "findings" of fact that he set forth in his

background section; and (2) this Court's decision – specifically, its "Background" section – has

obviated this objection. That is, the Court (without any reference to Magistrate Judge Kay's

"factual findings") took into account all evidence currently before it in the present summary

judgment record when setting forth the "facts" relevant to Counterclaim Defendants' summary

judgment motion, often giving C&C the benefit of the doubt despite a glaring absence of

evidence on its part in many cases.

Third, C&C has consistently requested client information from the U.S. member firms of

Counterclaim Defendant GLOBALAW Limited to allegedly "reveal" confusion and untoward

profits. Part of this request by C&C has been a demand for an accounting from Counterclaim

Defendants. C&C's request for an accounting is related to, and dependent upon, its claims that

Counterclaim Defendants have been unjustly enriched through their violations and it (i.e., C&C)

has suffered damages from Counterclaim Defendants' abridgement of both the Lanham Act and

common law.  *See* C&C's Mot. for Recons. at 16-30.  To the extent that Magistrate Judge Kay's

Opinion may address the issue of Plaintiff's demand that Counterclaim Defendants undergo an

accounting to reveal their profits, and to the extent that C&C may disagree with his rulings

relating to this issue, one thing is now clear – the issue is now irrelevant and moot.  It is

> well settled that in order for a Lanham Act plaintiff to receive an award of
> damages the plaintiff must prove either actual customer confusion or deception
> resulting from the violation, . . . or that the defendant's actions were intentionally
> deceptive thus giving rise to a rebuttable presumption of customer confusion.

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 493 (2d Cir. 1998)

(quoting *George Basch Co. v. Blue Coral Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992)).  Here, C&C

has failed to establish that "GLOBALAW" is a protectable mark; if it is a protectable mark, that

it has "secondary meaning" connecting the mark to C&C in the minds of the public; and that a

likelihood of confusion (either forward or reverse) exists.  Because C&C has not – and cannot –

succeed on the merits of its claims, it is simply not entitled to damages, or an accounting relating

to those damages.  As such, C&C's accounting-related requests, and objections to Magistrate

Judge Kay's Opinion relating to its accounting demand, are now irrelevant and moot.  Indeed,

given that accounting-related information (centered around profits) is completely separate and

distinct from discovery relating to liability, such data would not have assisted C&C in the context

of Counterclaim Defendants' Motion for Summary Judgment, and cannot be a basis for C&C's

Rule 56(f) argument.

Upon a review of C&C's Motion for Reconsideration, as well as the Rule 56(f) section of

its larger Opposition to Counterclaim Defendants' Motion for Summary Judgment, only one real

issue remains:  C&C's demand that Counterclaim Defendants identify their multitude of clients

by name so that C&C may track them down and interview them regarding whether there has been

"willful infringement, bad faith infringement, deception, or actual confusion of any of them."

C&C's Mot. for Recons. at 17; *see also* C&C's Opp'n to Countercl. Defs.' Mot. for Summ. J. at

3.  The Court notes that two major problems undermine this request, and therefore C&C's Rule

56(f) argument.[24]

   First, C&C's request is clearly overbroad, intrusive, overly burdensome, and improper in

light of clearly privileged information.  In Lanham Act cases, the names of the defendant's

customers or clients are rarely – if ever – revealed.  *See, e.g., Foxworthy v. Sun Art Designs, Inc.*,

42 U.S.P.Q.2d 1317, 1318 (S.D. Fla. 1997) (where the court precluded discovery of customer

lists when the plaintiff claimed, as here, it wanted to interview customers to discover evidence of

confusion, and finding, *inter alia*, that any evidence of confusion acquired after prompting would

be hearsay and lack foundation); *Johnston Pump/Gen. Valve Inc. v. Chromalloy Am. Corp.*, 10

U.S.P.Q.2d 1671, 1675 (T.T.A.B. 1988) (stating that in regard to a request for customer names

during a deposition, that "a party need not reveal the names of its customers (including

dealers)"); *Sunkist Growers, Inc. v. Benjamin Ansehl Co.*, 229 U.S.P.Q. 147, 149 (T.T.A.B.

1985) (noting that "[t]he Board fails to see that whatever need opposer may have for such names

. . . outweighs the possible harm, such as harassment of its customers, which might result to

applicant"); *J.B. Williams Co. v. Pepsodent G.m.b.H.*, 188 U.S.P.Q. 577, 580 (T.T.A.B. 1975)

("While a party must respond to an interrogatory concerning the classes of customers who

purchase its products sold under the mark, as a general rule it need not furnish the names of

---

[24] The Court does point out that nowhere in C&C's vast array of filings does C&C ever
argue that Counterclaim Defendants have subsequently withheld any information that Magistrate
Judge Kay ordered them to provide.

actual customers, it being sufficient that the types of businesses involved be specified."); *see generally* Trademark Trial and Appeal Board Manual of Procedure, Ch. 400, § 414(3) (stating that "the names of customers constitute confidential information, and generally are not discoverable, even under protective order").  Here, as Magistrate Judge Kay correctly found, Counterclaim Defendants have done what is required of them – they have identified the class of customers who purchase their legal services and have clearly specified how and in what manner they use the mark "GLOBALAW."  To allow more, and compel the client lists of Counterclaim Defendants to be turned over, would amount to a fishing expedition for which C&C has been unable to establish the slightest foundation.  Simply, it was well-within C&C's powers to have obtained, through recognition surveys and other discovery-related devices, any evidence of confusion or secondary meaning that it otherwise could have gathered directly from Counterclaim Defendants' clients.

Second, while C&C might like to claim that its failure to put forth sufficient evidence to survive Counterclaim Defendants' Motion for Summary Judgment is somehow related to discovery that remains to be provided or discovery wrongly denied by Magistrate Judge Kay, such an assertion is completely devoid of merit.  Indeed, C&C's failings are not due to any evidence not produced by Counterclaim Defendants; rather, they are the result of C&C's own inability to produce evidence within its possession, custody, or control, or within the public domain.  Namely, the Court is faced with a situation where:  (1) C&C has failed to meet its burden and/or rebut Counterclaim Defendants' substantial evidence suggesting that "GLOBALAW" is actually a generic term that cannot be granted trademark protection; (2) C&C has failed to offer any kind of survey taken from the purchasing public that would indicate that

"GLOBALAW" does have some non-generic meaning or that C&C has established "secondary meaning"/"primary significance" over the term; (3) C&C – beyond offering terse, incompetent declarations from three of its customers – has never surveyed its own customer base in order to provide some support for its "secondary meaning" or "likelihood of confusion" arguments; (4) the three customers chosen by C&C actually express no viewpoint on "likelihood of confusion," and two of the customers did not come to C&C until after Counterclaim Defendants began their usage, thereby rendering their declarations basically irrelevant; (5) C&C itself has employed the "GLOBALAW" mark in an extraordinarily inconsistent manner, and has frequently changed its argument as to what its "GLOBALAW, Inc." actually is; and (6) C&C has failed to show that its services substantially overlap with the services of Counterclaim Defendants, or that they ever serve the same markets and clientele.  Indeed, not a single C&C client has come forward to say that they were confused by Counterclaim Defendants' use of the mark, nor has C&C located any member of the "purchasing public" who can either associate the term "GLOBALAW" with C&C (or Counterclaim Defendants, for that matter) or say that they were confused by the conflicting usages.

Simply, C&C has not made the kind of foundational showing that would ever allow a court to contemplate compelling additional "client name" discovery from a defendant.  C&C's case is based on assertion, innuendo, and aggressive attack, with a dearth of evidentiary support.  Ultimately, the major problems with its case – and its own inability to locate supporting evidence within its control – makes further discovery fruitless, especially given the long discovery process leading up to this point, and the extensive information already provided.  Accordingly, the Court shall deny C&C's Motion for Further Discovery Pursuant to Federal Rule of Civil Procedure

56(f) as without merit, and shall deny C&C's Motion to Reconsider the November 14, 2005

Opinion and Order of Magistrate Judge Alan Kay, as it is – in varying degrees – moot, irrelevant,

and without merit.

## IV: CONCLUSION

Ultimately, the Court has been very forgiving of C&C's repeated failings in addressing

Counterclaim Defendants' Motion for Summary Judgment.  Despite the fact that C&C failed to

comply with Local Civil Rule 56.1 in responding to Counterclaim Defendants' Statement of

Material Facts Not in Dispute, the Court did not automatically accept as conceded Counterclaim

Defendants' Facts; rather, the Court carefully parsed the record to determine the relevant factual

background.  Despite the fact that C&C relies in its argument almost entirely on the belated

affidavit of Haggai Carmon, which in many ways firmly contradicts the deposition testimony

offered by both Carmons, the Court refused to jettison the affidavit from its consideration.

Despite the fact that assertions contained within Mr. Carmon's affidavit are often supported by

no evidence currently before the Court and in the present record, the Court refused to reject his

conclusory allegations based on the doctrine set out in *Leigh*, *Poullard*, and other cases.  Finally,

despite the fact that C&C had significant trouble finding any competent evidence establishing

that it was the senior user of the "GLOBALAW" mark, a fact essential to its claims, the Court

proceeded with the entirety of the Lanham Act analysis.

Despite the Court's forgiveness, C&C has plainly failed to avoid summary judgment at

every juncture.  C&C was unable meet its burden in establishing that the contested

"GLOBALAW" mark is in fact protectable.  Instead, virtually all evidence reveals that the term

is generic.  Even assuming that C&C had met its obligation and could show that "GLOBALAW"

is not a generic mark, the mark is descriptive at best.  While descriptive terms may be protected

from trademark infringement, such terms must have acquired a "secondary meaning" to obtain

that protection.  "GLOBALAW," however, has not achieved secondary meaning.  Even if C&C

somehow could show that "GLOBALAW" has acquired secondary meaning, there is simply no

likelihood of confusion – either forward or reverse – between C&C's use of the term and

Counterclaim Defendants' usage.  Given these key failures, it is evident that C&C's trademark

infringement counterclaims cannot survive summary judgment.

Accordingly, for the reasons set forth above, the Court shall (1) grant Counterclaim

Defendants' Motion for Summary Judgment as to all counts contained within C&C's

Counterclaim; (2) deny C&C's Motion for Further Discovery Pursuant to Federal Rule of Civil

Procedure 56(f); (3) deny C&C's Motion to Reconsider the November 14, 2005 Opinion and

Order of Magistrate Judge Alan Kay; and (4) deny without prejudice as moot Counterclaim

Defendants' Objections and Motion to Strike Evidence Submitted in Support of C&C's

Response to Counterclaim Defendants' Motion for Summary Judgment.

Given that C&C's Counterclaim is wholly without merit, and is now dismissed, there is

no need to consolidate this case with C&C's action against Dennis Campbell, which was brought

in a new Complaint filed with this Court on April 27, 2006.  *See* Compl., *Carmon & Carmon v.

Dennis Campbell*, Civ. A. No. 06-769 (CKK).  Accordingly, the Court shall also deny C&C's

recent Motion to Consolidate Cases.[25]

---

[25] Counterclaim Defendants have also filed a Motion to Stay C&C's new case against
Dennis Campbell in this action pending resolution of their present summary judgment motion.
*See* [Docket Entry # 197].  Because this ruling effectively decides Counterclaim Defendants'
potential liability prior to any court action in the new case, Counterclaim Defendants' Motion to
Stay must be denied as moot.

Moreover, (1) given the contours of this ruling, i.e., that "GLOBALAW" is a generic term or is – at best – descriptive with no secondary meaning and no likelihood of confusion, and (2) given the general thrust of Counterclaim Defendants' own evidence and argument, it is reasonable to question whether Counterclaim Defendant/original Plaintiff GLOBALAW Limited can continue to insist that it has a protectable interest in the mark.  *See* Compl. ¶¶ 19-20.  By September 25, 2006, GLOBALAW Limited is to provide the Court with a report that either shows cause why this case should not be completely dismissed in light of this Court's ruling or accedes to the dismissal of this action in its entirety.  An appropriate Order accompanies this Memorandum Opinion.

Date:   September 11, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge